[Crim. No. 4337. Second Dist., Div. One. Nov. 8, 1951.]

THE PEOPLE, Respondent, v. JOHN K. HESS et al., Appellants.

Russell E. Parsons and Morris Lavine for Appellants.

Fred N. Howser, Attorney General, Henry A. Dietz, Assistant Attorney General, and David K. Lener, Deputy Attorney General, for Respondent.

WHITE, P. J.—Defendants were indicted by the grand jury of Los Angeles County in an indictment containing six counts. Subsequently, an amended indictment was filed containing four counts. The first count charged a conspiracy to violate sections 424 (embezzlement, misappropriating, making profit out of public moneys by public officers, etc.) and 504 of the Penal Code (fraudulent appropriation or secretion of public property by officer of the state, etc.), and section 14420 of the Government Code (corrupt performance of an official act to the injury of the state). Ten overt acts were alleged.

Count II charged violation of section 504 of the Penal Code.

Count III charged violation of section 424 of the Penal Code.

Count IV charged violation of section 14420 of the Government Code.

Defendants moved to quash the amended indictment on the grounds that (1) there was no reasonable or probable cause for the indictment; (2) no proper endorsement thereof; (3) the offenses charged were barred by the statute of limitations; (4) the indictment was vague, indefinite and uncertain and does not state a public offense; (5) was in violation of the 14th Amendment to the Constitution of the United States, and (6) that section 14420 of the Government Code is vague, indefinite, uncertain and unconstitutional.

Defendant Greer moved to set aside the amended indictment on the ground that it was not found, endorsed and presented as prescribed by the Penal Code. All defendants demurred to the indictment. The motion to quash the indictment under section 995 of the Penal Code was denied, the demurrers were overruled, and each defendant entered his plea of not guilty to each of the offenses charged in the amended indictment.

The indictment was amended for a second time, deleting from Count I the charge of violation of section 424 of the Penal Code, making certain deletions of and additions to the overt acts charged under Count I, and striking Count III from the indictment.

All defendants demurred to the second amended indictment and defendant Greer also made a motion to set the same aside on the ground that it was not endorsed and presented as prescribed by the Penal Code. A motion was also made under section 995 of the Penal Code to set aside the second amended indictment. The demurrers were overruled and the motions were denied.

The cause proceeded to trial before a jury on Counts I, II and IV of the second amended indictment, resulting in verdicts finding the defendants guilty as charged on all counts. Each defendant moved for a new trial, which motions were denied.

From the judgments of conviction and the order denying their motions for a new trial defendants prosecute this appeal. ■ Judgments were pronounced against defendants Hess and Rose, but as to defendant Greer the proceedings were suspended and he was granted conditional probation. Therefore, as to him, the attempted appeal from the judgment must be dismissed and his appeal determined only upon the correctness of the order denying him a new trial.

The offenses charged in the second amended indictment were the outgrowth of a transaction in which appellants

allegedly participated relative to the purchase by the State of California of certain property located at 800-802½ North Ardmore Avenue, in the city of Los Angeles (hereinafter referred to as Parcel 307), for the right-of-way of the Hollywood Parkway or Freeway in said city.

Appellant Greer is a real estate broker engaged in business in the city of Los Angeles since 1935. Appellants Hess and Rose were California state right-of-way agents.

The procedural steps employed to acquire rights-of-way through negotiation by the Department of Public Works, Division of Highways, State of California, and particularly in acquiring rights-of-way for the aforesaid Hollywood Parkway or Freeway were set forth in detail in the case of *People v. Hess*, 104 Cal.App.2d 642, 656, 657 [234 P.2d 65], to which case reference is made for a statement of such procedure.

Epitomizing the evidence which gave rise to this prosecution the record reflects that in October, 1945, Leroy Brigham, an attorney, had a "For Sale" sign on the aforesaid Parcel 307 in behalf of an estate in which he had an interest. One James W. Schollenberger first met appellant Greer about 1940 or 1941 and occasionally visited him socially. They were apparently on friendly terms. In March, 1942, Schollenberger entered the Air Corps service where he remained until discharged on terminal leave which became final on November 25, 1945. The latter part of August of that year, while he was still in military service, Schollenberger contacted appellant Greer with a view to obtaining an apartment. In the latter part of September, 1945, he received a telephone call from appellant Greer telling him that he could buy a three-unit place and evict one of the tenants. Subsequently, Schollenberger told Greer that at the time he did not have enough money to buy the property but Greer told him "not to worry about it, that he would take care of everything."

The first time that Schollenberger knew the State of California was interested in purchasing the property in question was in October, 1945, at which time he signed the right-of-way contract.

The record reflects that at all times after November, 1943 it was the plan of the State Highway Department to include Parcel 307 in the Hollywood Freeway project. There was no change in the design of the freeway with reference to the acquisition by the state of said parcel from 1943 to 1946.

In November, 1943, an alignment map was prepared by the

State of California for Parcel 307. In January, 1944, a title report relating to the acquisition by the state of said parcel and listing the aforesaid Leroy Brigham as owner, was submitted to the Division of Highways.

In February, 1944, copy of a grant deed relating to Parcel 307 was prepared for the signature of Mr. Brigham.

In March, 1945, appellants Hess and Rose initialed the "double transfer letter," in which all state right-of-way agents were cautioned against dealing with third parties rather than with the owners of property, at the expense of the state.

On September 19, 1945, appellants Hess and Rose went on a field review of the Hollywood Freeway in the area between Vermont and Western Avenues with Messrs. Cortelyou, District Engineer, E. N. Whittemore, District Right-of-way Agent, and Mr. Phillips, a State Highway Engineer.

This field review included four fringe parcels among which was the aforesaid Parcel 307. Cortelyou instructed Hess and Rose to purchase said parcel in its entirety. Whittemore made notations on the work map as follows: "Take all, 9-19-45 E.N.W." He made these notations after he had received Cortelyou's instructions and while in the field. He made similar notations as to the other parcels involved.

On or about September 19 or 20, 1945, Whittemore had a conversation with appellants Hess and Rose, instructing them to open up negotiations for the purchase of Parcel 307.

On October 23, 1945, appellant Greer applied for and purchased a cashier's check for $500 payable to the aforesaid James W. Schollenberger.

On or about October 13, 1945, when the escrow was first opened in Schollenberger's name, it was appellant Greer and not Schollenberger who told Mr. Cookman, manager of the bank in which the escrow was pending, that he had located an excellent buy and that he knew that the state was going to purchase that property. Appellant Greer instructed Mr. Cookman to type out the Brigham-Schollenberger escrow instructions. Appellant Greer also gave all the necessary information pertaining to the escrow instructions and took the same out of the bank to secure the signature of Schollenberger. The latter was not with appellant Greer at the bank when the escrow was opened. Appellant Greer informed the bank manager that no moneys had been paid out of escrow. Appellant Greer later returned to the bank with the signature of Schollenberger on the escrow instructions and deposited in

the escrow the aforesaid $500 cashier's check which then contained the endorsement of Schollenberger.

About October 15, 1945, appellant Greer came into the bank and told the manager that he would need a bank loan to complete the purchase of the property and that he had definite information that the state would purchase the property for $14,500 in a very few months. The bank manager advised appellant Greer that it would be necessary for the bank to appraise the property and that Schollenberger's signature would be required on a financial statement. He also informed appellant that the bank would want definite confirmation of the fact that the state would pay $14,500 for the property.

A day or so later, about October 16, appellant Greer returned to the bank in company with appellant Hess. The latter presented his card to the bank manager and assured the latter that the state was definitely going to buy Parcel 307 and was going to pay $14,500 for it within two or three months. The bank manager informed appellant Hess that he would require written confirmation from the state, and a few days later he received a letter from appellant Hess, dated October 19, 1945, reading in part as follows:

"In answer to your inquiry relative to the property located at 800-802½ North Ardmore Avenue, which is legally described as Lot 27 of Charles S. Mann's Melrose Avenue Tract, we wish to advise you that this property is located in the path of the Hollywood Parkway, a state highway to be constructed between downtown Los Angeles and Hollywood.

"The California Highway Commission has passed a resolution authorizing this department to acquire the property, and we will be in a position to make acquisition of same within the next 90-day period at a figure disclosed by you to be the sales price in your current escrow. If there is any further information relative to this matter, we shall be happy to return the same by return mail."

Appellant Greer brought Schollenberger into the bank to sign the financial statement.

The bank manager could not recall having had any conversation with Schollenberger regarding the application for a loan. It was necessary of course for the loan to be in Schollenberger's name because the property was purchased in his name.

On November 26, 1945, appellant Greer purchased a cashier's check payable to the California Bank in the sum of $3,125, which was deposited in the escrow. Appellant Greer

did not have sufficient funds in his account with which to purchase the aforesaid cashier's check and obtained an emergency loan from the bank in the sum of $750. It is noteworthy that Schollenberger invested none of his own funds in the aforesaid transaction.

Notwithstanding the assurances given the bank by appellant Hess about October, 1945, that the state would pay $14,500 for the property, the record discloses that appellants Hess and Rose did not actually make any appraisal of the property until November 16, 1945, a month after appellant Hess had advised the bank manager that the state would definitely pay $14,500 for the property.

Appellant Hess testified that when he and appellant Rose made out their work sheet with reference to an appraisal they would date it ''at the time they did the work, at the time they made the inspection,'' and that when the appraisals were finally made up, they were given the date that the said right-of-way agents had placed thereon.

About a month after appellant Hess had talked to the bank manager with reference to the price the state would pay, he and appellant Rose prepared the allotment appraisal sheet for Parcel 307, appraising the same at $14,500 and listing Schollenberger as owner of the property.

The escrow did not close until November 27, 1945, on which date Schollenberger for the first time became legal owner of the property, and on November 29, 1945, appellants Hess and Rose submitted for approval by their superiors their allotment appraisal for Parcel 307, appraised by them in the sum of $14,500.

Neither appellants Hess nor Rose told any of their superiors that the property had been sold through an escrow for $10,000 on November 27, 1945, just two days before the date of their allotment appraisal, and according to the record, neither Messrs. Whittemore, Wagner or Cortelyou had any knowledge of the prior sale of the property for $10,000 on November 27, 1945, and testified that had they been so advised they would not have approved the allotment appraisal of appellants Hess and Rose for $14,500.

Raymond S. J. Pianezzi, Assistant Chief Right-of-way Agent of the State Highway Department, whose approval was the final one, said he approved the allotment appraisal on the basis of the recommendations of appellants Hess and Rose

who submitted it to him as being the fair market value of the property.

Appellants Hess and Rose both testified that they had no knowledge of the purchase of the property through escrow for $10,000, that the first time they learned of that transaction was in the latter part of 1947 when they read it in the newspapers.

On December 16, 1945, appellant Rose recommended to his superiors the approval of the right-of-way contract wherein the state agreed to purchase Parcel 307 for $14,500. These superior officers testified that none of them would have approved the right-of-way contract had they known about the prior sale of the property for $10,000.

On December 18, 1945, appellant Rose prepared a memorandum to Mr. Cortelyou in which he recommended the acquisition of Parcel 307 for $14,500. On February 26, 1946, appellant Rose approved the release to Schollenberger of the state warrant for $8,030.40, and on the same day he approved the release to the California Bank of the state warrant in the sum of $6,469.60 (the latter warrant was in payment to the bank for the loan of $6,375, plus interest, which loan had been previously arranged for by appellant Greer. The two sums, $8,030.40 plus the $6,469.60 total the price paid by the state in the sum of $14,500.)

On the last mentioned day Schollenberger met appellants Greer and Hess at lunch and signed a number of documents, including a state warrant.

With reference to the signing of these documents the witness testified, ''I would sign, and Mr. Hess (appellant) would just flip them back, like that, for my signature all the way through.''

On the same day, February 26, 1946, the state warrant for $8,030.40 was cashed and appellant Greer deposited $6,930.40 in his commercial account at the California Bank, First and Vermont Branch. Appellant Greer then gave appellant Rose $1,000 which he deposited in his bank account. Appellant Greer himself gave appellant Hess $1,000 on March 6, 1946, which was deposited by appellant Hess in a bank account bearing the name of his father and brother.

Appellant Greer later called Schollenberger on February 26, 1946, about an hour after the latter had left the former and appellant Hess at the restaurant. Appellant Greer asked Schollenberger to meet him at the bank where Schollenberger received $900 in cash from appellant Greer. Upon making inquiry as to what the money was for appellant Greer in-

formed Schollenberger it represented profit on the foregoing transaction. Schollenberger asked appellant Greer where the latter came in on the deal, but Greer said nothing. Appellant Greer also told Schollenberger that if anyone asked him anything about the deal to say that he had paid $3,500 out of escrow to Brigham (the former owner), since Brigham had died, and there would be no way of checking on it.

In February, 1947, Schollenberger received a telephone call from appellant Greer inviting him to have lunch. At the meeting appellant Greer inquired of Schollenberger as to whether he had noticed anything in the papers regarding trouble on the Hollywood Freeway deals. Appellant Greer told Schollenberger that if the latter was questioned about the deal with which we are here concerned, to say that the property was bought for $13,500 from Brigham and sold for $14,500. Appellant Greer also told Schollenberger that if any inquiry was made of the latter he should not state that he met appellant Hess through Greer, but should state that appellant Hess had contacted him directly.

About a week before he testified before the grand jury and while he was attending a university outside the state, Schollenberger received a telephone call from appellant Greer in which the latter inquired as to why Schollenberger had not contacted him before leaving. He further inquired of Schollenberger as to whether the property transaction here in question had any bearing upon it. Appellant Greer informed Schollenberger that there was a possibility that the latter might be called back to California to testify in regard to the property but that he (Greer) would do everything possible to keep Schollenberger from being called. Appellant Greer asked Schollenberger if the latter had been called to the district attorney's office and was informed that he had. Appellant Greer inquired as to what Schollenberger had stated at the district attorney's office and was informed that the latter had "told them the truth" of what he knew about the deal. Appellant Greer expressed regret that Schollenberger had not contacted him before appearing at the district attorney's office. Mr. Schollenberger said that he was taken to the district attorney's office at 8 o'clock in the morning and had no time to contact anyone. Appellant Greer then said to Schollenberger, "Well, why didn't you tell Mr. Black (a representative of the district attorney) that you wanted to see a lawyer or somebody like that before you went down?" to

which Schollenberger replied that he did not think it was necessary.

There was considerable expert testimony given by qualified appraisers who testified that the value of the property during October and November, 1945, ranged from $10,500 to $16,500.

As grounds for reversal appellants first contend that the jury was illegally constituted and not constituted in conformity with the laws of the State of California. That the jury was not a fair cross section of the community and therefore, violated both the Constitution and statutes of this state and the 14th Amendment to the Constitution of the United States.

The same contention, based upon similar grounds, was urged and exhaustively treated in the case of *People* v. *Hess, supra,* p. 847. Upon the grounds and for the reasons therein stated, appellants' claims herein must be resolved against them.

It is next asserted that no public moneys were involved, appellants contending "the money in this case, like that in the Wheeler case (*People* v. *Hess, supra*) was not public money. Once it was paid by the State of California to the seller of the property and became his property, it ceased to be *public money* and therefore, was not subject to the charge under section 504 of the Penal Code."

In the case last cited it was held that the moneys therein involved were public moneys (*People* v. *Hess, supra,* p. 853). In the instant case, appellants Rose and Hess, in their capacity as state right-of-way agents, knew that Parcel 307 must be acquired by the state to build a freeway long before it was acquired. They appraised the property, but did not, as they were required to do, approach the owner in an effort to obtain the property for the state at its actual value. Instead, they worked in conjunction with appellant Greer. It is only reasonable to assume that their appraisal was influenced by the knowledge that they were to share in the profit made over and above the $10,000 paid by appellant Greer through a "dummy" purchaser to the owner Brigham. A review of the evidence hereinbefore narrated reveals a course of conduct on the part of appellants teeming with fraud against the state, and replete with intrigue, deception and duplicity. It was reasonable for the jury to infer that had appellants Hess and Rose approached the owner as their duty required them to do, the state could have purchased the property for $10,000 instead of paying $14,500 therefor. Under the facts

and circumstances present in the instant case, to say that the evidence is insufficient to establish a violation of section 504 of the Penal Code "would exalt form and ignore substance" as we said in *People* v. *Hess, supra,* p. 854. Through the fraudulent and wilful dereliction of duty on the part of appellants Hess and Rose, acting in conjunction with appellant Greer, the state paid $4,500 more for Parcel 307 than it would have been required to pay had appellants Hess and Rose been faithful to their trust. When such so-called excess profit was appropriated to the use and purpose of appellants, their actions came squarely within the language of section 504 of the Penal Code.

Appellants next challenge the sufficiency of the indictment to charge a public offense and in support of such claim assert that the pleading and each count thereof was fatally defective in that (a) It charged in Count I that appellant Greer caused other persons to violate the statute; (b) It charged in Count II corrupting of themselves by Hess and Rose; and (c) It charged in Count IV the causing of other persons in the state to embezzle public money by performing a required duty of recommending a purchase.

These claims on the part of appellants cannot be sustained. Count I is not vulnerable to the interpretation placed upon it by appellants. It specifically alleged, not that appellant Greer did not commit the crime himself but caused others so to do, but that appellant Greer, acting in concert with appellants Hess and Rose wilfully and unlawfully entered into a corrupt agreement, the object of which was to cause officers of the state to corruptly perform official acts by reason of which other state officers innocently caused the misappropriation of state funds to the use and benefit of appellants Hess, Rose and Greer, the alleged conspirators, all to the injury of the state. When viewed in conjunction with the overt acts charged, the allegations of Count I were sufficient to inform the accused of the charges they would be required to meet at the trial (Pen. Code, § 950). The transcript of the testimony before the grand jury upon which the indictment was founded furnished appellants with the particular circumstances of the offense charged against them (Pen. Code, § 925).

Count II charges appellants with a substantive offense, to wit, the embezzlement by them of trust funds of the state in the control of appellants Hess and Rose. As was stated by this court in *People* v. *Hess, supra,* p. 854, "to constitute embezzlement it is not necessary to show actual posses-

sion of the money or property. It is sufficient to show that while an accused was not in actual possession of the money it was under his control in the sense that it was under his direction and management (*People* v. *Knott,* 15 Cal.2d 628, 631 [104 P.2d 33])." Count II charges that appellants Hess and Rose, "as deputies, clerks and servants of an officer of the State of California, with the advice, encouragement, and aiding and abetting, counseling and advising of the defendant, Frank O. Greer, did fraudulently appropriate to uses and purposes not in the due and lawful execution of the trust of the said defendants, John K. Hess and William E. Rose, public moneys in the sum of Four Thousand Five Hundred Dollars ($4,500.00), which said public moneys had been and was then in the possession and under the control of the said defendants, John K. Hess and William E. Rose, by virtue of the official trust reposed in the said defendants, John K. Hess and William E. Rose." ■ Count II was framed substantially in the words of section 504 of the Penal Code and was sufficient to state a public offense.

■ Count IV charges appellants with a violation of section 14420 of the Government Code in that appellants Hess and Rose, as officers and employees of the State Department of Public Works, counseled, aided and abetted by appellant Greer, did corruptly perform an official act to the injury of the state by recommending the approval of the purchase of the aforesaid Parcel 307. The charging part of this count specifically alleged that appellants Hess and Rose were officers and employees of the Department of Public Works of this state and then, in the language of section 14420 of the Government Code alleged that aided and abetted by appellant Greer they did corruptly perform an official act which resulted in injury to the state. As heretofore pointed out, the particular circumstances upon which the charge was predicated, were furnished appellants through the medium of the transcript of the testimony adduced before the grand jury.

Under our simplified forms of criminal pleading, the amended indictment was not deficient in any of the essentials of a valid accusation (*People* v. *Yant,* 26 Cal.App.2d 725, 730 [80 P.2d 506] ; *People* v. *Gordon,* 71 Cal.App.2d 606, 610 [163 P.2d 110]).

It is next contended by appellants that the verdicts are contrary to law and the evidence, and that the evidence is insufficient to sustain the verdicts. Appellants' claim that the money involved was not public money was, as hereinbefore

pointed out, decided adversely to them in *People* v. *Hess, supra,* pp. 852, 853). Having heretofore summarized the testimony concerning the various transactions upon which the verdict of the jury were founded we shall not here repeat them. Suffice it to say that under our holding in *People* v. *Hess, supra,* pp. 853, 854, there was substantial evidence in the instant case to support the guilty verdicts returned by the jury. ■ While appellant Greer was not a public official, nevertheless, if he aided and abetted appellants Hess and Rose who were public officials, he was chargeable as a principal in the commission of the alleged offenses.

Appellants urge that section 14420 of the Government Code is unconstitutional in two respects. (1) It is in violation of article IV, section 24 of the Constitution of the State of California which requires that the subject matter of a statute be expressed in the title; and (2) that the statute is also too vague, indefinite and uncertain to constitute penal legislation in that the word "injury" as used therein is not defined. ■ It is well settled that the aforesaid constitutional provision must be construed liberally to uphold legislation reasonably included within the general subject indicated by the title. ■ It cannot be said that the details of the liability provided for in the statute must be expressed in its title. ■ The title to an act is not expected to be an index to all its provisions so long as the provisions themselves are germane to the subject matter of the title (*Evans* v. *Superior Court,* 215 Cal. 58 [8 P.2d 467]). ■ A review of the provisions of section 14420 of the Government Code and the legislative history of the act of which it is a part readily suggests that it is included in the field of legislation encompassed by the text of the act.

■ As to appellants' second complaint that the word "injury" being undefined, is too vague, indefinite and uncertain to constitute penal legislation, it should be noted that the section in question provides that "any officer or employee of the department who *corruptly* performs any official act to the *injury* of the state, is guilty of a felony" (italics added).

The word "corruptly" qualifies the act denounced and is defined by section 7, subd. 3 of the Penal Code as, ". . . a wrongful design to acquire or cause some pecuniary or other advantage to the person guilty of the act or omission referred to, or to some other person."

■ When the word "injury" is read with the context of the offense charged, its meaning appears clear and free

from uncertainty or ambiguity. It is well recognized that in law the word "injury" has acquired a well defined and equally well understood definition. It simply means a wrongful invasion of legal rights. It is not concerned with the hurt or damage resulting from such invasion as is evidenced by the familiar phrase "damage without injury." It is an actionable wrong as distinguished from a physical hurt, or damage to a specific article of property. ▪▪▪ And in the instant action the word "injury" means a wrongful act which causes loss or damage to the state (see *People* v. *Smith,* 36 Cal.App.2d Supp. 748, 752 [92 P.2d 1039]). Section 14420 of the Government Code cannot therefore be strictured as having a double meaning or forcing anyone at his peril to speculate as to whether certain actions transgress it. The statute in question has no constitutional infirmities as claimed by appellants.

▪▪▪ Appellants next assert that the court erred in swearing two alternate jurors four days after the original jury of twelve as empaneled was sworn. Appellants do not contend that any evidence was taken prior to the time the alternate jurors were empaneled and sworn (Pen. Code, § 1089). The record reveals that on May 17, twelve jurors were sworn to try the cause. A request by the district attorney for alternate jurors was denied. The cause was continued due to the absence of a juror until May 20. On that morning a sworn statement was received by the court from the absent juror's physician. It read: "It is my opinion that Mrs. Beatrice V. Anderson is physically unfit at the present time to serve daily as a juror. Her condition indicates the necessity for a daily treatment which deems it advisable that she be excused."

The juror in question was present in court and in answer to interrogatories by the judge stated, "I am not feeling well"; that her condition "has been much worse" since she was seated in the jury box; that "although my X-rays were negative as far as cancer is concerned there is something there which needs further study and further observation and treatment." After further colloquy. between the court and juror as to the latter's condition of health the court asked, "Is it your request that you be excused from jury duty?" to which the juror responded, "I would like it very much." Preceding the foregoing and before any evidence was taken the court stated, "I do now change the order which I made denying the request of the district attorney for alternates, and I can very conscientiously say, after what has happened, that this will be a protracted trial; and I do order two alternate jurors

chosen.'' Two alternate jurors were thereupon selected, qualified and seated.

In connection with excusing the regular juror, the following minute order appears in the clerk's transcript:

''The Jury is in attendance as heretofore. Pursuant to her request, Mrs. Beatrice V. Anderson is ordered excused from further jury service. A sworn statement of Doctor E. W. Demarec regarding the physical condition of Mrs. Beatrice V. Anderson is filed. Alternate Juror, Mrs. Dorothy B. Letts, is called and substituted in place of Mrs. Beatrice V. Anderson. Each of the defendants John K. Hess, William E. Rose and Frank O. Greer enters his plea of once in jeopardy and former acquittal. Defendants' motion to discharge the jury on the ground of former jeopardy and former acquittal is denied.'' The first witness was then sworn on behalf of the prosecution.

No claim is made that the alternate juror seated was not in fact a fair and impartial person to act as a juror. The same proceedings were had in the selection of the alternate juror as in the case of the first twelve who took their places in the box.

We fail to perceive any invasion of appellants' substantial rights or any resultant prejudice to them in directing the selection of two alternate jurors in the manner aforesaid. They were selected prior to the introduction of any evidence and before the district attorney made his opening statement. They sat from the very inception of the proceedings that began with the introduction of the evidence; they had all the opportunities that were possessed by the regular jurors to see and hear the witnesses, and were bound by the same oath that was taken by the others to ''well and truly try the matter in issue and a true verdict render according to the law and the evidence.'' The three essentials and substantive attributes or elements of a trial by jury, viz., number, impartiality and unanimity, were preserved. The inviolability of trial by jury was not therefore impinged upon or outraged. For the reasons stated in *People* v. *Hess, supra,* page 861, appellants' contention that it was error to excuse Juror Anderson under the circumstances here present cannot be upheld.

Appellants urge that the failure of the court to submit the pleas of once in jeopardy and former acquittal to the jury requires a reversal of the judgments. We are not in accord with this contention. If, as we have held, the selection of the alternate jurors and the excusing of Juror Anderson

were substantially in accordance with the provisions of section 1089 of the Penal Code, it necessarily follows that jeopardy did not attach until after the alternate jurors were sworn and therefore, appellants faced but one jury (*People* v. *Burns,* 84 Cal.App.2d 18 [189 P.2d 868]).

As to appellants' claim that the court was guilty of prejudicial error in failing to submit the pleas of once in jeopardy and former acquittal to the jury, it undoubtedly is the law that where the issue of jeopardy is *based on questions of fact,* it is for the jury to decide (*People* v. *Frank,* 134 Cal. App. 211, 214 [25 P.2d 486]; *People* v. *Lachuk,* 5 Cal.App.2d 729, 731 [43 P.2d 579]). However, while generally speaking former jeopardy is a question of fact and hence should be passed on by the jury, in certain circumstances it may become purely a question of law (*People* v. *Gelardi,* 77 Cal.App.2d 467, 474 [175 P.2d 855]). In the instant case, a pure question of law was presented to the trial court. Under the circumstances here present, had the court submitted the issue of jeopardy to the jury, no evidence having been introduced in support thereof, and the question being purely one of law, it would have been the duty of the trial judge to instruct the jury to find for the prosecution on the special pleas (*People* v. *Newell,* 192 Cal. 659, 688 [221 P. 622]; *People* v. *Gelardi, supra,* p. 475; *People* v. *McNeer,* 8 Cal.App.2d 676, 683 [47 P.2d 813]). Manifestly, the failure to give such an instruction did not prejudice appellants.

Appellants predicate error on the giving and refusing to give certain instructions. In this regard, it was not error for the court to instruct the jury that appellants Hess and Rose, as right-of-way agents for the Division of Highways, were clerks, servants and employees of the State of California in the Department of Public Works within the meaning of Penal Code, section 504. No error was committed in advising the jury that on the question of control of state money, the signature of a right-of-way agent on a right-of-way contract, recommending its approval, "is one step in the procedure for causing the state to pay out public money for the purchase of real property for highway purposes." That, "therefore, Rose and Hess as right-of-way agents did have a measure of control over state money," and that "this was sufficient control to satisfy the requirement of section 504 of the Penal Code." Identical instructions were held not to be erroneous in *People* v. *Hess, supra,* pp. 862, 863.

Appellants earnestly urge that the court erred in giving an instruction reading as follows:

"There has been considerable evidence admitted in this case which was introduced by both the People and the defendants concerning two subjects: (1) The fair market value of the property; (2) knowledge, or the lack of knowledge, on the part of the defendants, that they knew on October 13, 1945 (opening of the Brigham-Schollenberger escrow) that the state was going to purchase the property.

"To enable you to properly evaluate this evidence and to determine whether the defendants caused the state to pay more for the subject property than was necessary it is necessary for me to relate to you the two theories of the People's case, either of which is entitled to your consideration.

"The People's first theory is that pursuant to, and as a direct result of, the alleged conspiracy between the defendants, Greer, Rose and Hess, the State was compelled to pay $4500.00 more for the property than it otherwise would have had to. Under this theory of the case it is unnecessary for you to consider any of the evidence concerning fair market value because, if you believe beyond a reasonable doubt that the State could have purchased the property for $10,000 and that as a result of the alleged conspiracy the State was compelled to pay $14,500, it becomes wholly immaterial that the fair market value of the property equalled, was less than, or even exceeded the amount the State was compelled to pay. Under this theory the question of knowledge or the lack of it, on the part of the defendants on October 13, 1945, that the State was going to purchase the property, becomes important in your determination as to whether or not the State could have purchased the property for $10,000.

"The People's second theory is that as a result of the alleged conspiracy between the defendants, the State in acquiring the property was compelled to pay a sum which was in excess of its fair market value. Under this theory all of the evidence concerning fair market value must be considered by you, because you must necessarily determine the fair market value of the property before you can consider whether or not the State paid a sum for the property which exceeded its fair market value. Under this theory, it is unnecessary for you to consider any evidence concerning knowledge or the lack of it by the defendants on October 13, 1945, that the State was going to acquire the property, because if you believe beyond a reasonable doubt that as a result of the alleged

conspiracy the State was compelled to pay more for the property than its fair market value, this particular knowledge or lack of it on the part of the defendants on October 13, 1945, becomes wholly immaterial.''

Appellants insist that the portion of the instruction embodying ''The People's first theory'' is purely hypothetical and speculative, and asks the jury to speculate on what the state might have done if they had negotiated with Mr. Brigham at the time he owned Parcel 307. A review of the evidence which we have hereinbefore set forth, dispels any assertion that the instruction was entirely speculative in its theory and scope. The evidence clearly warranted the following inferences: (1) That Hess and Rose knew the state was going to acquire Parcel 307 on September 20, 1945; (2) That Hess and Rose entered into a conspiracy with Greer and advised Greer of the prospective purchase of Parcel 307 by the state; (3) That Hess and Rose knew that Greer purchased the property in the name of Schollenberger as a convenient ''front'' for $10,000 when it was purchased and knew he was going to purchase it; (4) That the $1,000 that Hess and Rose each received from Greer was their share of the embezzled funds according to agreement.

If appellants Hess and Rose had followed the instructions given them on September 20, 1945, to acquire the property from the then owner (Brigham) instead of acting in concert with appellant Greer, it would seem only logical to conclude that the state could have purchased the property at the price of $10,000 because that was what appellant Greer paid for it through a ''dummy'' purchaser. There was evidence that appellant Greer received information from appellants Hess and Rose that the state would buy the property for $14,500, the precise amount for which the last-named appellants as state right-of-way agents appraised it.

The so-called ''second theory'' contained in the instructions is also challenged by appellants as being untenable and incorrect because fair market value they say, ''has nothing to do with a negotiated sale.'' We are inclined to the belief that the amount paid by the state is not controlling. That if appellants entered into a corrupt agreement and made a profit therefrom, that profit was illegal and appellants Rose and Hess were guilty of embezzlement since it was wrong for them to make such profit while occupying positions of trust and confidence with the state. And, if appellant Greer knowingly became a party to said agreement and aided and abetted

in its accomplishments he too was equally guilty as a co-conspirator and principal (*People* v. *Hess, supra,* p. 854).

Furthermore, the second portion of the instruction was justified by the evidence as well as by the fact that the "fair market value" of the property was made an issue in the trial and so treated by appellants who also introduced evidence thereon. We find no prejudicial error in the giving of this instruction.

The court committed no error in admonishing the jury that if convinced beyond a reasonable doubt that the crime of embezzlement was committed, any civil rights the State of California may or may not have exercised or had a right to exercise became wholly immaterial. The proposition that a duty rested upon the state to institute civil proceedings to rescind its contract with Schollenberger for the purchase of the property was attempted to be injected into the trial by appellants. What civil rights the state possessed or did not possess were foreign to any issue involved in the criminal prosecution.

Appellants challenge the correctness of an instruction given with reference to Count IV wherein the court stated that, "If Rose and Hess in appraising the subject property at $14,530.00 and if Rose in recommending that the state buy the property for $14,500.00, did so under an agreement with Greer that they would receive from Greer a secret profit or fee for so doing and if this caused injury to the state, Rose and Hess are guilty of the offense charged in Count IV of the second amended indictment."

Appellants contend that Count IV did not charge corrupt performance by appellants Rose and Hess "under an agreement with Greer that they would receive a secret profit for so doing," and thereby causing injury to the state. That such a concert or agreement was not charged in the indictment. However, to prove a conspiracy it need not be charged in the indictment or information. The corrupt agreement may be proven without charging it in the indictment. It is but a probative fact. It is not necessary that the participants in such alleged corrupt agreement should be charged and tried for the offense of criminal conspiracy (*People* v. *Descant,* 51 Cal.App.2d 343, 348 [124 P.2d 864]). The indictment however, did charge that appellants Hess and Rose were aided and abetted by appellant Greer. The fact that appellants might have been prosecuted under section 67½ or 68 of the Penal Code does not militate against the

right of the prosecution to proceed under section 14420 of the Government Code when, as here, the alleged conduct and actions of appellants come within the purview of the last-mentioned statute.

Appellants challenge the correctness of the court's instruction on the subject of accomplices wherein it was stated: "You must give it (testimony of an accomplice) the weight to which you feel it to be *entitled after* examining it with care and caution and in the light of all the evidence in the case." It is appellants' claim that the court should have inserted the words "if any" between the words "entitled" and "after" to which we have added emphasis in the above quoted portion of the instruction. We are cited to no authority in support of appellants' contention, but assuming, as stated by them, that it is customary to phrase the instruction as they suggest, it does not appear to us as material, nor does it change the meaning of the instruction or add anything to it. The instruction as given is an exact duplicate of instruction 829 set forth at pages 653 and 654 of CALJIC.

Contrary to appellants' contention, the court properly instructed the jury that a conspiracy may be established by circumstantial evidence. The courts have repeatedly held that a conspiracy may be established by circumstantial evidence alone and that the question presented was whether the conspiracy had been established. The court correctly told the jury that the establishment of a conspiracy might be proved by direct evidence or circumstantial evidence or by both, and that in determining whether or not a conspiracy had been established it was necessary to take into consideration all the facts and circumstances shown by the evidence. The court further advised the jury that their first duty was to find whether or not a criminal combination or agreement did in fact exist, and that if it did, which, if any, of the defendants were parties to such conspiracy.

We come now to a consideration of appellants' contention that the court erred to their prejudice in refusing to give certain instructions submitted by them. Appellants' proffered instructions numbered 9, 13, 20, 21, 22, 23, 28, 29, 31 and 33 were properly refused upon the authority of *People* v. *Hess, supra,* pages 861, 862, 863, 864. Furthermore, the subjects of some of the instructions just enumerated were covered by other and correct instructions given.

Equally without merit is appellants' claim that the court erred in refusing their proposed instructions reading: "If you find that Mr. Schollenberger bought this property at

a time when he did not know whether the State was going to take it over you should acquit the accused.''

It was not contended at the trial nor was there any evidence that Schollenberger had any knowledge whatsoever of the agreement entered into by the appellants. The evidence clearly shows that he was an innocent participant in the entire transaction, used by appellant Greer as an unsuspecting conduit for the accomplishment of the purposes and designs of all the appellants. If the law was as declared in appellants' proposed instruction, the guilty would escape punishment by simply routing their perfidy through the medium of an innocent person as an instrumentality for the accomplishment of their unlawful purposes. To state the proposition is to answer it.

▮▮▮ Remembering that instructions should be considered in their entirety and not singly (*People* v. *Hess, supra,* p. 864), a perusal by us of all the instructions given satisfies us that the jury was fully, correctly and fairly advised of the kind, quality and degree of proof requisite to a conviction under all counts of the indictment. Nothing further was required.

▮▮▮ Giving consideration to appellants' contention that the court erred in the admission and exclusion of evidence, we are satisfied that an objection to the proffered testimony *on direct examination* of the witness Mrs. Alamay Smith as to the value of her property located in the same block as Parcel 307 and which she had sold to the state for the Hollywood Freeway was properly sustained. The testimony was not admissible on direct examination of the witness. (*City of San Luis Obispo* v. *Brizzolara,* 100 Cal. 434, 436, 437 [34 P. 1083] ; *City of Los Angeles* v. *Cole,* 28 Cal.2d 509, 518 [170 P.2d 928] ). Such testimony is admissible for a limited purpose only—impeachment.

▮▮▮ No error was committed in overruling objections to questions propounded to Supervising Right-of-Way Agent E. F. Wagner concerning the practice of the state to buy property below the appraised value, and whether, had the witness Wagner known of the sale of Parcel 307 for $10,000 two days before the date of the allotment appraisal by appellants Hess and Rose, he would have approved such allotment appraisal (*People* v. *Hess, supra,* 855.)

▮▮▮ Appellants next assert that the court was guilty of prejudicial misconduct during the argument to the jury by one of appellants' counsel. In this connection the record reflects that while Attorney Lavine, counsel for appellant Greer,

was addressing the jury he read from the transcript certain remarks made by the court during the trial with reference to what the prosecution contended. The court interrupted counsel's argument to remark, "I did not say those facts were true," to which Attorney Lavine replied, "I understand that." Then the following ensued:

"The Court: You are not arguing to the jury that I have told them already that those facts were true or that agreement had been made?

"Mr. Lavine: No.

"The Court: And from what you read from the transcript prior to that I think it is perfectly clear to the jury that my statement was that this is one theory of the prosecution. Go right ahead."

Thereupon, another portion of the court's remarks was read by Attorney Lavine which he sought to answer when the court interrupted saying:

"The Court: I did not say that on this question of knowledge: and I would like to ask you to discuss this question. You have spent fifteen minutes yesterday afternoon and all this morning on pointing out the evidence as to the time the defendants acquired knowledge that the State was going to purchase this property. And you have argued, I take it, that on and at all times prior to October 13, 1945, that none of the defendants knew the State was going to purchase this property.

"I am sure they did because that is the date they went into escrow, the date the escrow instructions were signed—I am not sure whether Mr. Brigham signed them that day or not; But the contract is the escrow instructions in this case. I am wondering what your ideas are as to whether it is sufficient for the jury to find that, the defendants did not know that the State was going to buy this property on the date the contract for sale was made, when it is undisputed that before the sale was completed, and in order to finance the purchase of this property, and not later than October 16, 1945, the defendants all knew that the State was going to buy the property, the sale not having been completed until after that date because the money was not available, was not paid even though the contract had been made.

"I would be interested in hearing your discussion as to what difference it would make if the jury find that the defendants did not learn of the proposed sale to the State until October 16th, in view of the fact as I have just stated it, that

the purchase price was not paid and the financing was not arranged.

"It is just about time for recess, if you want to think over that proposition.

"Mr. Lavine: I will state my position now and answer fully after recess.

"The Court: All right.

"Mr. Lavine: It is my position that without any knowledge when they commenced the transaction, dating back to October 3rd, when the cashier's check was bought, that once the escrow was commenced and the deal was started it would not make any difference what knowledge was acquired afterwards, because specific performance for that contract could have been made—the terms of the escrow date back to the beginning of the escrow, as a matter of law; and it is my position that that shows the complete innocence of the defendants. I will discuss it after recess."

The jury was then excused and counsel for appellants and respondent engaged in a discussion of what the court had stated during the trial. During this discussion Attorney Lavine assigned as misconduct the interruption by the court "to argue matters with me in the presence of the jury," and requested the court to instruct the jury "to disregard the statements made by Your Honor in the middle of my argument." After further discussion the court said, "Frankly, I have been considering my instructions on this point, and I am considering that, and I am asking your assistance now with a view as to what instructions I will give, because it is not my policy to let an attorney make an argument which is entirely contrary to the instructions which I give, because that puts the attorney in really a bad light with the jury and his client; and I don't want any attorney who is arguing before a jury in my court to be embarrassed by arguing a theory which involves propositions of law which I knock out completely on my instructions; and I was attempting to save that embarrassment on your part . . . Now, I have never been accused of being unfair to counsel when I have advised them ahead of time of the things that are in my mind; and for the first time I have heard counsel object to my doing it; on questions of law.

"I still think that it is fair to give you the opportunity to argue to the jury anything that you want to in regard to that, after I determine what instructions of law I will give to the jury on that." Then there follows a discussion con-

cerning contemplated instructions to be given to the jury. When the jurors were returned to the courtroom the trial judge admonished them as follows:

"Ladies, we have had considerable discussion since you left and have not as yet reached the point where we can proceed with the argument. I don't want you to draw any inferences from any of the questions which I asked Mr. Lavine as to what I think the law is or is not in connection with the question which I asked him. I shall attempt in my instructions to give you the law on that point. I shall attempt to advise the counsel as to what instructions I expect to give, so that they may continue their arguments to you in the light of those instructions. But I haven't intended to intimate what my view of the law is or the importance of these two dates, or knowledge that the State was going to buy this, knowledge on the part of the defendants prior to the 13th of October as distinguished from on or before the 16th."

At the outset it should be remembered that the statements originally made by the court and to which Attorney Lavine was referring in his argument to the jury involved only questions of law and at the time they were made, no exception was taken to them. It appears that appellants' chief complaint goes to the interruptions of the court rather than to what the trial judge had to say. The foregoing excerpts from the record would indicate that the statements made by the court in the presence of the jury were intended to correct a possible erroneous impression that the court was attempting to invade the province of the jury as triers of fact and to clarify the issues so that appellants' counsel might not be embarrassed by instructions which the court intended to give of its own motion. The admonition given the jury was specifically to that effect and was sufficient to remove any contrary belief on the part of the jury.

We have read the record carefully and cannot say that the court transcended the line of its duty in the management and trial of the cause. We perceive no conduct of the trial judge that might be attributed to a purpose to throw his judicial weight into the scales against the accused on trial before him. We find nothing in the record that would justify the assumption that at any time the trial judge directly or indirectly assumed the guilt of the appellants or employed language or phrases, equivocal or otherwise, which might leave such an impression. We are satisfied that in the instant case it cannot justly be said that the conduct of the trial judge was so

grossly improper as irresistibly to lead to no other conclusion than that the rights of appellants were thereby seriously prejudiced, and they, therefore, denied a fair and impartial trial according to the law of the land. For these reasons, the result reached in the court below cannot be set at naught.

Contrary to appellants' contention, the record herein as above set forth, contains substantial evidence to justify a conclusion by the jury of guilty knowledge upon the part of all appellants.

Finally, appellants Rose and Hess urge that insofar as section 1203 of the Penal Code restricts the right of the trial judge to grant them probation following their conviction of embezzling public money in the discharge of their duties in public office or employment, it is unconstitutional. A similar contention was urged by these appellants in the case of *People* v. *Hess, supra,* page 865, and determined adversely to them. Therefore, the similar contention made in the instant case must be held to be without merit.

From a consideration of the voluminous transcript in this case containing 1,674 pages and the briefs made up of 368 pages we are convinced that appellants received a fair and impartial trial and that their conviction rests upon legal and substantial evidence.

For the foregoing reasons, the judgments and the orders denying a new trial as to defendants Hess and Rose are, and each is affirmed. The attempted appeal of defendant Greer from the judgment is dismissed and the order denying his motion for a new trial is affirmed.

Doran, J., and Drapeau, J., concurred.

A petition for a rehearing was denied November 20, 1951, and appellants' petition for a hearing by the Supreme Court was denied December 6, 1951.