**Harold E. LIVINGSTON, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 53S00–8803–CR–295.**

Supreme Court of Indiana.

Oct. 18, 1989.

Susan K. Carpenter, Public Defender and David P. Freund, Deputy Public Defender, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen. and Gary Damon Secrest, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Following a jury trial in the Monroe Superior Court, Defendant–Appellant Harold Livingston was convicted of Murder and Robbery and was sentenced to a term of forty-five (45) years.

Five issues are presented for our review in this direct appeal:

1. erroneous excusal of a juror after the jury had been sworn and subsequent refusal of the trial court to grant Livingston's motion for a mistrial;

2. sufficiency of the evidence;

3. refusal of the trial court to permit Livingston to introduce photographic exhibits into evidence;

4. error of the trial court in permitting a State's witness to introduce improper photographic exhibits; and

5. permitting the State to introduce a hair into evidence without establishing a proper chain of custody.

Livingston also alleged ineffective assistance of counsel but claimed trial counsel did not properly prepare the issue for briefing and withdrew it from consideration at this time. Therefore, the issue of ineffective assistance of counsel will not be discussed in this opinion.

The facts show that Livingston and Allen DeMoss were both charged with the murder of Allen's cousin, Ronnie DeMoss. Allen DeMoss gave several statements to the police, implicating himself and Livingston, pleaded guilty and was sentenced to a term

of forty years. He testified for the State. It appeared Allen DeMoss was offered an opportunity to get ten years reduced from his sentence in return for his testimony. The facts showed that on March 4, 1986, victim Ronnie DeMoss was arrested and charged with molesting and exploiting Travis DeMoss, Allen's younger brother. Allen knew of the charges and was aware of the possibility that Ronnie DeMoss had taken exploitative photographs of his brother, demonstrating the sexual encounter. Allen was also aware of allegations that Ronnie had molested another cousin. Allen claimed that he, himself, had been molested by Ronnie in the past. Allen then decided to seek revenge by stealing various electronic accessories out of Ronnie's trailer. To that end, he had arranged to sell some of the items to others. In the week preceding the perpetration of this crime, Allen was living in his car which was parked behind Ronnie's trailer. Livingston invited Allen to stay at Livingston's house because his parents were out of town and DeMoss accepted. They spent much of their time drinking beer and vodka and discussed the contemplated burglary of Ronnie's home. Livingston was known to have expressed disdain for "faggots" and "queers" and agreed to help in the burglary. When the two of them left the house of a friend to go to Ronnie's trailer, Livingston told the occupant of the house he was going to do something about the "faggots" in the neighborhood.

Ronnie let the two of them into the trailer and while Allen was arranging to select items to take, Livingston grabbed Ronnie from behind and started to beat him. Allen hauled items out of the house and saw Livingston striking Ronnie on the floor but did not see a knife in his hand. Ronnie died from a number of stab wounds. After they left the residence, Livingston threw the knife into a field. It was later recovered and bloodstains on it were consistent with the blood of the victim. Hair found on the knife and on Ronnie's clothing were consistent with Livingston's type.

I

The question presented is whether jeopardy attaches when the twelve member jury is sworn but the alternates have not been selected and sworn. Indiana has not yet faced this precise situation but its resolution by other jurisdictions is helpful to our consideration of the issue.

The record here reflects that after both prosecution and defense had the opportunity to individually question John Ostler, both sides accepted him as the twelfth juror. The trial judge immediately swore in the twelve jurors. The trial judge then announced to counsel and to the sworn jurors that two alternate jurors were going to be selected and the twelve just sworn would be excused while that was being done. At that point, John Ostler, who had just been sworn as a juror, informed the court that after having thought about it overnight, he realized he vaguely knew a John Livingston but had not realized it earlier when the name of John Livingston had been read as one of the potential witnesses who might testify. The trial court then conducted a hearing at which it was determined that the John Livingston known by Ostler was Harold Livingston's brother who was listed as a possible witness. Ostler testified he had never talked with Livingston about this case nor even knew that John Livingston was connected to this case. He knew John Livingston as a bartender, had become friendly with him and thought he would tend to believe his testimony because he considered him a truthful person. On questioning by the court and counsel, Ostler stated he would be willing to fairly weigh all the evidence and make determinations of credibility including John Livingston's but admitted it might be difficult for him. The State then challenged Ostler and the trial judge granted the challenge removing Ostler. He then advised everyone they would select a replacement for Ostler as well as two alternate jurors with the parties having the right to use their remaining peremptory challenges. Livingston objected to Ostler's removal and moved for a mistrial which was denied by the trial court.

We start with the well established principle that a defendant is in jeopardy when the jury selected to try his cause is sworn. This principle was well articulated by Jus-

tice Jasper in *Maddox v. State* (1951), 230 Ind. 92, 102 N.E.2d 225:

> This court has decided on numerous occasions that when a person is properly charged with a crime, has been arraigned and pleaded to such charge, has been put upon his trial before a tribunal properly organized and competent to try him for the offense charged, and a jury has been impaneled from persons competent to sit on the trial and duly sworn, then jeopardy attaches.

*Id.* at 98, 102 N.E.2d at 228 (citing *Armentrout v. State* (1938), 214 Ind. 273, 275, 15 N.E.2d 363; *Gillespie v. State* (1907), 168 Ind. 298, 80 N.E. 829; *Adams v. State* (1884), 99 Ind. 244).

Further, however, it is well established that defendant is not placed in jeopardy until the entire jury is sworn and is fully constituted to try the defendant on the charges brought. Judge Robertson, writing for a unanimous court in *Godfrey v. State* (1978), 177 Ind.App. 644, 380 N.E.2d 621, held that jeopardy had not attached when two of the twelve jurors had not taken the oath. In *Godfrey*, at the close of the giving of the oath, two jurors remained standing and stated they had not taken the oath and would suffer real hardship if they were to sit on the jury. Both of those jurors were excused by agreement of the parties. The following morning the trial court declared a mistrial and discharged the jurors who had been sworn over the defendant's objection. The trial court found that jeopardy had not attached because some members of the putative panel were not sworn and he thereupon excused all of the panel and had the parties select an entire new jury. Although the Court of Appeals felt the action of the trial judge in excusing the entire panel was questionable, it found there was no error in the actions of the trial court because jeopardy had not attached. The Court of Appeals found one is not in jeopardy when the trial starts and one or more of the jurors have not been sworn. *Id.* at 646, 380 N.E.2d at 622. We agree that a jury is not fully constituted and in a position to try the cause until the entire jury has been sworn.

The question here is what effect the use of alternate jurors pursuant to Ind.R.Tr.P. 47(b) has in the final constitution of the jury. The State contends the entire jury was not selected and sworn until the alternates were selected and sworn along with the original twelve. Although there is no Indiana or United States Supreme Court case directly on point, the principle stated in *Godfrey* has been interpreted with respect to alternate jurors as meaning the entire jury is not sworn and jeopardy has not attached until the alternates are impaneled and sworn. California decided this issue in a factual situation very similar to the instant case in *People v. Burns* (1948), 84 Cal.App.2d 18, 189 P.2d 868, *cert. denied* (1948), 335 U.S. 844, 69 S.Ct. 66, 93 L.Ed. 394. In *Burns*, a jury of twelve had been selected and sworn to try the case and were then admonished and allowed to separate until trial. The court then announced its intention to impanel alternate jurors. In selecting alternate jurors the court was acting pursuant to § 1089 of the California Penal Code which provided for the use of alternate jurors similar to provisions of our trial rule 47(b). After one alternate was selected but not sworn, the court learned that one of the twelve regular jurors had a hit and run charge pending against him. Over objection of the defendant, the court removed the juror, swore the alternate and seated him on the regular panel in place of the excused juror. The trial court rejected a motion for dismissal and discharge on double jeopardy grounds, and the defendant advanced that argument on appeal. The California Supreme Court acknowledged that jeopardy attaches when the jury is impaneled and sworn but found that previous cases which considered the issue had not dealt with the more recent enactments which provided for the use of alternate jurors. The court found the rule still applies whether there are alternates or not but saw as the central question whether jeopardy would attach when the original twelve were sworn or whether it attached only after the full complement of jurors of both classes were impaneled and sworn. It then concluded:

> For these reasons we are unable to follow appellants' argument that jeopardy attached in this case when the original

twelve jurors were sworn, but must hold that it attached only after the alternate juror was sworn, hence that the defendants faced but one jury.

*Id.* at 26, 189 P.2d at 872. *Burns* was reaffirmed based on similar facts in *People v. Hess* (1951), 107 Cal.App.2d 407, 425–26, 237 P.2d 568, 579.

■ In 1949, one year after *Burns,* Pennsylvania decided *Commonwealth v. Almeida* (1949), 362 Pa. 596, 68 A.2d 595, *cert. denied* (1950) 339 U.S. 924, 70 S.Ct. 614, 94 L.Ed. 1346. Pennsylvania had a provision similar to California's statute and to our rule 47(b) permitting the selection of two alternate jurors if, in the opinion of the judge, the trial is likely to be protracted. Pennsylvania's and California's provisions were again similar to our rule 47(b) in that the alternates were to take the same oath as the other jurors selected, were to attend the trial at all phases in company with the other jurors and were to be excused only after a verdict had been reached. The Pennsylvania court held:

> The court [below] held that under the [alternate juror provision] fourteen jurors, including the two alternates, must be sworn before the trial can proceed, and the accused is not in jeopardy until "all fourteen are sworn and, until that time, any one of the jurors previously accepted and sworn may be challenged with the reasonable discretion of the trial judge." We agree with this.

*Id.* at 636, 68 A.2d at 614–15 (footnote omitted). The principle was again affirmed by California in *In re Mendes* (1979), 23 Cal.3d 847, 153 Cal.Rptr. 831, 592 P.2d 318:

> We hold that the selection of a jury in a criminal case is not completed and jeopardy does not attach until all of the jurors, including any alternate jurors, are sworn.

*Id.* at 850, 153 Cal.Rptr. at 832, 592 P.2d at 319. We find this reasoning to be sound and consistent with the settled law in Indiana expressed in *Maddox, supra,* and *Godfrey, supra,* and cases cited therein. The very purpose of adopting provisions for selection of alternate jurors was to resolve the frustration caused by problems demonstrated in the instant case and those we have cited. With the use of alternate jurors, the need to replace one of the original panel easily can be done by assigning the first alternate to that position and continuing the trial. It follows that the final selection of the jury that will try the defendant's case is not complete until the regular panel and the alternates, who sit with the regular panel and may very well act as a member of it, have been sworn.

Further, we see no impingement of Livingston's constitutional interest. The United States Supreme Court in *Wade v. Hunter* (1949), 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974, reasoned:

> The double-jeopardy provision of the Fifth Amendment, however, does not mean that every time a defendant is put to trial before a competent tribunal he is entitled to go free if the trial fails to end in a final judgment. Such a rule would create an insuperable obstacle to the administration of justice in many cases in which there is no semblance of the type of oppressive practices at which the double-jeopardy prohibition is aimed. There may be unforeseeable circumstances that arise during a trial making its completion impossible, such as the failure of a jury to agree on a verdict. In such event the purpose of law to protect society from those guilty of crimes frequently would be frustrated by denying courts power to put the defendant to trial again. And there have been instances where a trial judge has discovered facts during a trial which indicated one or more members of the jury might be biased against the Government or the defendant. It is settled that the duty of the judge in this event is to discharge the jury and direct a retrial. What has been said is enough to show that a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments.

*Id.* at 688–89, 69 S.Ct. at 837, 93 L.Ed. at 978. This language was approved by the United States Supreme Court in *United States v. Jorn* (1971), 400 U.S. 470, 480, 91 S.Ct. 547, 554–55, 27 L.Ed.2d 543, 554 and *Illinois v.*

*Somerville* (1973), 410 U.S. 458, 470, 93 S.Ct. 1066, 1073, 35 L.Ed.2d 425, 434.

In view of our holding, we need not consider the question of whether the legal necessity exists for withdrawing submission of the case to the original panel or changing it by removing one or more of its members. Neither do we reach the question raised by Livingston of the propriety of the court removing the juror in question here without first withdrawing submission of the case to the entire panel. Because we hold that the jury was not yet fully constituted as the entire jury had not been sworn, the procedure followed by the trial judge was proper and no error was presented.

## II

■ Livingston claims there was insufficient evidence to support his convictions for robbery and murder, basing his contention on the fact that circumstantial evidence in general was weak and that the eyewitness testimony of Allen DeMoss was inherently incredible. In view of the evidence here, this is an invitation for us to reweigh the evidence and credibility of the witnesses and substitute our judgment for that of the jury. It is well established that we do not do this as an appellate tribunal. Appellant points out that there were inconsistencies in Allen DeMoss' testimony and that there were apparent motives for him to murder the victim. The jury heard all of these facts and acted within their area of responsibility in weighing the evidence. In addition to Allen's testimony, there was much circumstantial evidence in favor of the judgment, and our examination of this evidence on appeal is to determine whether inferences could reasonably be drawn by the jury which sustained the verdicts. *Mills v. State* (1987), Ind., 512 N.E.2d 846, 848. The evidence showed that Livingston was in possession of the murder weapon before and after the commission of the crime; that he was known to have an animosity toward those he called "faggots" and "queers" and professed that he was going to do something about the "faggots" in the neighborhood immediately before this crime was committed. Other statements and actions of Livingston following

the crime were of similar weight. It is true Allen did not see Livingston stab Ronnie DeMoss with a knife. He did see him striking DeMoss many times while DeMoss lay on the floor, but he said he did not pay enough attention to it to have observed the knife. Ronnie was stabbed several times, however, and immediately after leaving Ronnie's trailer, Livingston was in possession of the knife which had blood and hair on it and disposed of it in a field.

There was sufficient probative evidence before the jury to support their verdicts.

## III

Livingston claims the trial court erred by refusing to allow into evidence photographs of the murder victim, Ronnie DeMoss, engaged in sexual acts with Allen DeMoss' younger brother.

Prior to the beginning of trial, the State filed a motion *in limine* asking the trial court to order Livingston not to bring to the attention of the jury any prior misconduct of Ronnie DeMoss. The trial court denied the motion.

Livingston's theory of the case was that Allen DeMoss, who repeatedly denied having any intent to physically harm Ronnie DeMoss or that he actually stabbed him, viciously killed his uncle, not only in revenge for Ronnie DeMoss' molesting Allen's younger brother, but also for having molested Allen himself as a child. There was considerable evidence introduced by the State which established that Ronnie had been arrested on March 4, 1986, a little less than three weeks before he was murdered, and charged with sexually molesting and exploiting Allen's twelve year-old brother. Both of Ronnie's parents testified that he had been arrested for child molestation and Mrs. DeMoss knew there were some pictures involved.

Allen testified that he knew his uncle had been arrested for molesting Travis and that he was not surprised because Ronnie had attempted to molest him, Allen, when he was younger. Allen believed Ronnie had also molested some of his other cousins. Allen admitted the reason he decided to steal Ronnie's television, stereo and VCR

was for revenge for his brother Travis and to teach Ronnie not to molest kids. On cross-examination, Allen said he knew Ronnie had taken pictures of Travis and that the police had the pictures but he had never seen them. He admitted he had stated one of the reasons he went to Ronnie's trailer was to prevent Ronnie from showing any pictures of Travis and that he would have taken any photographs of the nature described had he seen them in Ronnie's trailer. He also testified he did not like homosexuals.

On cross-examination of Allen, Livingston attempted to introduce into evidence Exhibits O, P, Q, R, and S which were the photographs in question, apparently taken by Ronnie during his sexual encounter with Travis. The State objected to the admission of these photographs, claiming they had no probative value and that any value they might have was far outweighed by the prejudicial effect they might have on the jury by outraging them. The trial court found the photographs were irrelevant in that they did not prove anything because the evidence established Allen had never seen the photographs; thus, he could not have been motivated by them and, further, he could not be a sponsor of them because he could not identify them. The defense again attempted to place the same exhibits into evidence through Indiana State Police Detective Allcron. Detective Allcron testified he first saw the photographs on or about February 27, 1986 during an investigation of Ronnie DeMoss for child molestation. He also testified that in his opinion, the motive for killing Ronnie DeMoss was robbery and revenge. Allcron also testified he never showed the pictures to Allen DeMoss or told him they existed. The court again refused admission of these exhibits through Detective Allcron for the reason that Allen DeMoss had never seen them, although he believed photographs existed, and his motive could not have been based on photographs. The court found them to be irrelevant for that reason and would not introduce something to the jury that "was not a part of it [motive]."

■■■■ We do not find the trial court abused his discretion in refusing these exhibits. In the first place, the court correct-

ly found that because Allen DeMoss had never seen the photographs, they could not be the basis for his revulsion and rage. Second, Allen and others had already testified about Allen's knowledge of the molestation of his younger brother, that photographs of the encounter existed and that Allen had thoughts of revenge against Ronnie. In that regard, the photographs were nothing more than cumulative, and any error that might arguably be noted was harmless.

### IV

Livingston objects to the testimony of State's witness, Oliver, who was permitted to give an opinion concerning the comparison of a photograph of a boot to a photograph of a footprint. His objection is that the scale for such comparison was not accurate as a foundational matter to support his opinion.

The evidence showed technician George Abbott of the Indiana State Police went to Ronnie Demoss' trailer on March 22, 1986 and obtained a set of footprints which appeared to have been made by western or cowboy style boots with a wide instep and deep heel. Abbott took a photograph of the footprint to show it as he saw it. He then overlaid a tape measure and rephotographed the footprint so that a measurement could be made of the footprint and demonstrate to scale its length. The photograph without the tape measure was Exhibit 35 and the one with the tape measure was Exhibit 36. State Police laboratory physical comparison analyst Michael Oliver testified he was asked to compare the negatives of photographs of a footprint to a photograph of a boot. He stated he made State's Exhibits 35 and 36, two black and white photographs, from slides of the footprints prepared by Abbott. He attempted to make both photographs the same size for a one-to-one depiction for comparison purposes. He then compared the photographs with Exhibit 24 which showed Livingston's boots. Livingston's objection to the exhibits was not the comparison by Oliver of the footprint and the boots because he concedes anyone can give an opinion on the similarity of footprints, citing

*Halbig v. State* (1988), Ind., 525 N.E.2d 288, 291 and *Johnson v. State* (1978), 177 Ind.App. 501, 380 N.E.2d 566. *Johnson* was cited with approval by this Court in *Hartlerode v. State* (1984), Ind., 470 N.E.2d 716, 717. Livingston's objection is that the attempt to give credibility to the photographs by the use of the tape measure was misleading because the round lens of a camera distorts the picture it takes from the center out and, therefore, the measurement depicted in the photograph is not accurate. This was demonstrated by having Oliver take a ruler and measure the photograph which revealed that in some areas of the photograph the inch lines were more than an inch apart and in other areas less than an inch. Apparently, Livingston's claim is that the exhibits misled the jury into believing the photographs were to scale when they actually were not. Abbott and Oliver both testified that there would be a distortion in a photograph but it would not be significant for the purposes of these exhibits. Significantly, Oliver was unable to make a definitive statement about his comparisons. He testified he was unable to say the footprints matched Livingston's boot print but that the prints could have been made by Livingston's boot. No issue is presented meriting reversal.

## V

Livingston claims the court improperly permitted a hair into evidence because a proper chain of custody had not been established.

 Indiana State Police evidence technician George Abbott testified he gained possession of a buck knife which was labeled State's Exhibit 11. He placed it in a white envelope which he numbered Exhibit No. 19, sealed it and placed his initials on it. He submitted it to the State Police laboratory with a request that two hairs appearing on the knife be compared with known samples from Allen DeMoss, Ronnie DeMoss, and Harold Livingston. Testimony showed the sealed envelope came to the State Police Laboratory in the sealed condition and was examined by State Police forensic chemist, Judith Macechko. She removed the knife from the envelope and removed two hairs which she then placed in a separate plastic bag and stapled the plastic bag to the white envelope which was labeled Exhibit 19. The plastic bag was labeled Exhibit 19–A. Physical comparisons analyst Michael Oliver received Exhibit 19–A from the evidence clerk, found it to be in a sealed condition, made an analysis of it, resealed it and returned it to the evidence clerk. Macechko and Oliver both testified the contents of the exhibit appeared to be the same as it was when they had seen it during their examinations. Livingston's claim of lack of showing of chain of custody is that the laboratory custodian did not testify regarding the passage of the exhibit through her hands. He claims this hiatus breaks the chain assuring there was no tampering of the exhibit and, therefore, the exhibit was inadmissible. Livingston did not object to the admission of Exhibit 19–A which contained the hair in question. All of the witnesses who testified in regard to the course of travel of Exhibits 19 and 19–A established that, before and after the exhibit went to the clerk who had custody of items of evidence, the exhibit was sealed and appeared to be in the same condition it was when the witness last saw it. The State need not provide evidence excluding all possibility of mishap or tampering, but need provide only reasonable assurance that the evidence passed through various hands in an undisturbed condition. *Simmons v. State* (1987), Ind., 504 N.E.2d 575, 578; *Borom v. State* (1984), Ind., 470 N.E.2d 712, 714–15. In *Smith v. State* (1983), Ind.App., 452 N.E.2d 160, the Court of Appeals held that testimony from the clerk at the State Police post who had custody of fungible items was not a necessary witness to establish chain of custody for an item where the item was placed in and passed in a sealed envelope, giving reasonable assurance the exhibit passed through the various hands in an undisturbed condition. We agree and find that such reasonable assurance was demon-

strated here. No error is presented on this issue.

The trial court is affirmed.

SHEPARD, C.J., and DeBRULER, GIVAN and DICKSON, JJ., concur.