[Crim. No. 21956. Dec. 17, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH MARIO ARMENDARIZ, Defendant and Appellant.

574

576

**COUNSEL**

Quin Denvir and Frank O. Bell, Jr., State Public Defenders, under appointment by the Supreme Court, Thomas F. Lundy, Deputy State Public Defender, and Musawwir Spiegel for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Daniel J. Kremer, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Garrett Beaumont and Robert D. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BIRD, C. J.**—This is an automatic appeal from a judgment imposing a penalty of death under the 1978 death penalty law. (Pen. Code, § 190.1 et seq.; see Pen. Code, § 1239, subd. (b).)[1]

Appellant, Joseph Armendariz, was charged with killing Joe Velasquez, the father of his common law wife Alice Velasquez. The prosecution contended that appellant killed Velasquez during the commission of a burglary and robbery. The defense contended that appellant went to Velasquez's house only to look for a place to sleep and discovered Velasquez's body. Appellant's brother testified that it was he, not appellant, who killed Velasquez in the course of an argument which occurred earlier in the evening.

A jury convicted appellant of first degree murder (§§ 187, 189), and found that the murder was committed during the commission of a robbery (§§ 190.2, subd. (a)(17)(i); 211) and a burglary (§§ 190.2, subd. (a)(17)(vii); 460). Additionally, appellant was found guilty of robbery and first degree burglary. At a penalty phase hearing, the jury fixed the penalty at death.

Numerous assignments of error are presented to this court for review. Among them, appellant contends that (1) he was wrongly denied the exercise of 22 of his 26 peremptory challenges when the trial court refused to reopen jury selection after two regular jurors were excused for cause before the alternate jurors were sworn, and (2) both special circumstance findings must be set aside, under *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], and *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], since the jury was not instructed to determine whether appellant intended to kill during the commission of the homicide.

Both contentions have merit. Furthermore, the erroneous denial of peremptory challenges requires reversal of the entire judgment. Accordingly, with the exception of one evidentiary issue which will be addressed for

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

guidance on retrial, this court need not reach appellant's other assignments of error.

## I.

■ This court's recent decisions in *Carlos* and *Garcia* compel reversal of both the felony-murder-based special circumstance findings and the penalty judgment. *Carlos* held that before a special circumstance allegation may be sustained, the trier of fact must find that the accused intended to kill or aid in a killing. (35 Cal.3d at pp. 153-154; *People v. Garcia, supra,* 36 Cal.3d at pp. 547-549.) Since the trial court failed to instruct the jury on this issue, this court must determine whether that omission was prejudicial.

*Carlos* error is reversible per se unless one of four exceptions is applicable. (*People v. Garcia, supra,* 36 Cal.3d at pp. 554-556.) None of these exceptions applies here. Appellant was not "acquitted" of the special circumstance allegations, and he did not concede the issue of intent. (*Id.,* at p. 554.) No other instruction required the jury to resolve the issue of intent for the case was submitted on a felony-murder theory. Thus, it cannot be said that "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions." (*Id.,* at p. 555, quoting *People v. Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].)

Finally, this is not a case in which "the parties recognized that intent to kill was in issue, presented all evidence at their command on that issue, and in which the record not only establishes the necessary intent as a matter of law but shows the contrary evidence not worthy of consideration." (*Id.,* 36 Cal.3d at p. 556, fn. omitted; see *People v. Thornton* (1974) 11 Cal.3d 738, 768-769, fn. 20 [114 Cal.Rptr. 467, 523 P.2d 267], and *People v. Cantrell* (1973) 8 Cal.3d 672, 685 [105 Cal.Rptr. 792, 504 P.2d 1256].) Any possible evidence negating an intent to kill would have been irrelevant and may have been withheld from the trier of fact. Since none of the exceptions to the rule of per se reversal applies, the two felony-murder special circumstance findings must be reversed. (*People v. Garcia, supra,* 36 Cal.3d at pp. 554-556.)

## II.

■ Next, this court considers appellant's claim that his exercise of peremptory challenges was erroneously restricted.

During selection of the 12 members of the jury, the defense exercised only 4 of its 26 peremptory challenges. (See § 1070.) After the jury panel

was sworn, the court announced that five alternates would be selected. Pursuant to section 1089,[2] each side was given five peremptory challenges to prospective alternate jurors.

Before selection of the alternate jurors began, defense counsel requested that the alternates be numerically ordered so they could be substituted in that order if any impaneled jurors were excused during trial. Counsel informed the court that he could use his five peremptory challenges more effectively if he knew which of the alternates was most likely to be impaneled. The court denied this request, ruling that in the absence of a stipulation section 1089 required alternates to be "drawn" randomly to replace any discharged juror. The prosecutor declined to enter into any stipulation.

While the alternates were being selected but before they were sworn, two regular jurors were discharged.[3] Thus, it was certain that at least two alternates would become part of the regular panel. At this point, defense counsel stated that he had twenty-two unused peremptory challenges and asked to be allowed to use two of them in addition to the five authorized by section 1089. The court denied this request on the ground that section 1089 precluded any additional challenges.[4]

The selection of alternates continued, and defense counsel exhausted his five peremptory challenges. He moved to reopen selection of the regular jury and to be allowed to exercise his 22 unused challenges. Alternatively, he moved to strike the 10-member jury panel and the seated alternates or to be allowed to exercise 5 additional peremptory challenges against prospective alternate jurors. The court summarily denied all these requests.

The final alternate juror was examined and seated. This juror was one of the two whose names were then drawn at random to be impaneled.

---

[2]Section 1089 provides in relevant part that ". . . the prosecution and the defendant shall each be entitled to as many peremptory challenges to such alternate jurors as there are alternate jurors called."

[3]One juror sustained injuries which made it impossible for her to continue to serve. Another juror's fiance suffered serious injuries in an automobile accident and was hospitalized in another city. Her fiance could not be moved, and in his conscious moments he called for the juror's presence. Both counsel stipulated that there was good cause to discharge these jurors. (See § 1123 ["If before the jury has returned its verdict into court, a juror becomes sick or upon other good cause shown to the court is found to be unable to perform his duty, the court may order him to be discharged. . . ."].)

[4]The prosecutor offered to stipulate to an increase in the number of alternate jurors with a corresponding increase in the number of peremptory challenges. The court indicated that it would accept such a stipulation. However, the court also made clear that it would not allow the number of peremptory challenges to exceed the number of alternate jurors. Defense counsel accordingly declined to so stipulate. That response was appropriate. Simply enlarging the pool of alternates from which two regular jurors would be randomly selected would not enable counsel to make more effective use of his one-for-one peremptory challenges.

The court's ruling made clear that it believed it had no authority to grant any of defense counsel's requests. Unfortunately, the court was apparently unaware that this court had held a year earlier that a trial court *does* have the power to reopen jury selection and authorize the use of unused peremptory challenges before all the alternates are sworn. (*In re Mendes* (1979) 23 Cal.3d 847 [153 Cal.Rptr. 831, 592 P.2d 318].)

In *Mendes,* 12 regular jurors were sworn. Before any alternates had been selected, one juror was unable to serve and was discharged. The trial court ruled that two alternates would be selected. During this selection process, the trial court permitted each counsel to exercise unused peremptory challenges against impaneled jurors. (*Id.,* at p. 851.)

On appeal, the defendant claimed that the trial court lacked the authority to allow counsel to use the remaining peremptory challenges on jurors already sworn. He argued that the trial court had discharged a sworn jury without legal necessity so former jeopardy applied and further proceedings were barred.

This court unanimously rejected the argument that the trial court's action amounted to a discharge of the jury. (See § 1123.)[5] The court explained that a jury cannot be discharged before it is "completed." (*Mendes, supra,* 23 Cal.3d at p. 853.) ▮ "The general rule is that where a court has indicated that a trial will be conducted with alternate jurors the impanelment of the jury is not deemed complete until the alternates are selected and sworn. [Citation.]" (*Ibid.*)

*People* v. *Burns* (1948) 84 Cal.App.2d 18 [189 P.2d 868], cited in *Mendes,* explains why jury selection is not "complete" until alternates—if they are to be selected at all[6]—have been sworn. Relying on section 1089, *Burns* observed that this section "requires that the 'alternate jurors shall be seated near, with equal power and facilities for seeing and hearing the proceedings in the case, and shall take the same oath as the jurors already selected, and must attend at all times upon the trial of the cause in company with the other jurors[] . . .' [¶] . . . The oath which they must take is the same as that which the regular jurors take, viz., to try the particular case

---

[5]Section 1123 provides in relevant part: "If, after all alternate jurors have been made regular jurors or if there be no alternate juror, a juror becomes sick or otherwise unable to perform his duty and has been discharged by the court as provided herein, the jury shall be discharged and a new jury then or afterwards impaneled, and the cause may again be tried."

[6]It is a matter for the trial court's discretion how many, if any, alternates will be chosen. As section 1089 states in part, "[w]henever, in the opinion of a judge . . . about to try a defendant against whom has been filed any indictment or information or complaint, the trial is likely to be a protracted one . . . the court may direct the calling of one or more additional jurors, in its discretion, to be known as 'alternate jurors.' . . ."

and render a verdict therein. The oath is administered to them at the very outset, and is not postponed until some emergency might call them into the box. But most compelling of all . . . is the statutory requirement that the additional jurors 'must attend at all times upon the trial of the cause in company with the other jurors . . .' This means that not a syllable of testimony can be introduced until the 'additional jurors' have been sworn to try the case. *If, therefore, the jury cannot function until the alternates have qualified, the jury cannot be said to be complete or impaneled until that time.*" (*Id.,* at pp. 25-26, italics added; see also *People* v. *Davis* (1972) 27 Cal.App.3d 115, 118-119 [103 Cal.Rptr. 494]; *People* v. *Hess* (1951) 107 Cal.App.2d 407, 425-426 [237 P.2d 568].)

 Since a jury is not "complete or impaneled" until all the alternates are sworn, a trial court retains the power under section 1068 to allow the exercise of peremptory challenges up until these jurors take their oath. Section 1068 provides that a challenge to a juror "must be taken when the juror appears, and before he is sworn to try the cause; but the Court may for cause permit it to be taken after the juror is sworn, and before the jury is completed." As *Mendes* held, "[t]his section clearly contemplates that there may be an appreciable interval between the moment when a juror is sworn and the point at which the jury is deemed to be complete. It has long been established that a peremptory challenge may be made to a juror during this interlude if there is good cause for the failure of an earlier exercise of the challenge. [Citations.]" (*Mendes, supra,* 23 Cal.3d at p. 855.)

It is clear from this record that the trial court was unaware that section 1068 authorized it to reopen jury selection under these circumstances. Thus, its ruling cannot be affirmed as an informed exercise of discretion. Rather, the court believed that it lacked the authority to reopen jury selection and permit counsel to exercise his remaining peremptory challenges. To affirm the court's ruling would be to overrule *Mendes.* No reason, compelling or otherwise, appears to call for such a drastic move, particularly since that decision is of such recent vintage.[7]

 Even if the trial court had been aware of the scope of its authority, denial of counsel's request to reopen jury selection would have been an abuse of discretion under the circumstances of this case. This conclusion is apparent from *Mendes.*

The *Mendes* court held there was good cause to reopen selection when only one regular juror had been excused. "[B]ecause the composition of the

---

[7]Additionally, it should be noted that the trial court had the authority, contrary to its stated belief, to grant counsel's request that the alternates be numerically ordered and substituted in that order. (*People* v. *Davidian* (1937) 20 Cal.App.2d 720, 727 [67 P.2d 1085].)

12-member panel was to change, there was a valid reason for the court to allow peremptory challenges so that both sides could satisfy themselves to the best of their ability with the final composition of the jury. The court's motivation in permitting use of the remaining peremptory challenges was clear for it said 'There is a possibility that somebody might have in the back of their mind that the new juror wouldn't fit in with the total panel. Once it's opened up, I'm going to open it up all the way across the board. You still have as many challenges left as you're entitled.'" (*Mendes, supra,* 23 Cal.3d at p. 855.)

As this passage from *Mendes* demonstrates, a party's right to exercise peremptory challenges to a full panel (§ 1088)[8] is compromised when remaining challenges are disallowed at a time when there is less than a full jury. Here, the remaining challenges were disallowed when there were *two* openings. ■ ■ ■ ■ This was an even greater infringement of the "opportunity for comparison and choice between jurors . . . essential to the exercise of a right so visionary and fanciful." (*Lewis* v. *United States* (1892) 146 U.S. 370, 378 [36 L.Ed. 1011, 1014, 13 S.Ct. 136].)[9]

■ Furthermore, this is a case in which appellant was entitled to 26 rather than 10 peremptory challenges. (§ 1070.)[10] As this court recently noted, section 1070 manifests a legislative intent "to allow greater protection to those few criminal defendants who, if convicted, were likely to receive the most severe penalties." (*People* v. *Yates* (1983) 34 Cal.3d 644, 648 [194 Cal.Rptr. 765].) The court's refusal to allow appellant to use over two-thirds of his challenges at a point when the composition of his jury was clearly not final directly contravened this legislative intent.

---

[8]Section 1088 provides in relevant part that "each party shall be entitled to have the panel full before exercising any peremptory challenge." "The theory of the law probably is that the right to challenge peremptorily cannot be exercised so judiciously until the panel is filled with competent and qualified jurors . . . ." (*People* v. *Scoggins* (1869) 37 Cal. 676, 680.)

[9]The full exercise of this right dictates that when jury selection is reopened because a vacancy is created on the panel before the jury is "complete," the trial court must seat alternates in the jury box so that the box is full when peremptory challenges are resumed. The vacancy means that one or more of the alternates will certainly become regular jurors, and the trial court must acknowledge this reality by seating the alternates as such. *Mendes* implicitly mandated such a procedure when it stated that the reopening of challenges was "merely a continuation of the jury selection which had been previously commenced." (*Mendes, supra,* 23 Cal.3d at p. 855.)

[10]Section 1070 provides in part that "[i]*f the offense charged be punishable with death,* or with imprisonment in the state prison for life, *the defendant is entitled to 26 and the state to 26 peremptory challenges.* Except as provided in subdivision (b) [allowing only six peremptory challenges for certain misdemeanors], on a trial for any other offense, the defendant is entitled to 10 and the state to 10 peremptory challenges." (Italics added.)

The two defendants in *Mendes* were charged with offenses carrying a maximum penalty of three years. Thus, they were allowed only the smaller number of peremptory challenges. (See § 1070.5.)

Finally, it should not be forgotten that this is a capital case. "The United States Supreme Court has expressly recognized that death is a different kind of punishment from any other, both in terms of severity and finality. Because life is at stake, courts must be particularly sensitive to insure that every safeguard designed to guarantee defendant a full defense be observed. [Citation.] Thus, in striking a balance between the interests of the state and those of the defendant, it is generally necessary to protect more carefully the rights of a defendant who is charged with a capital crime. [Citations.]" (*Keenan* v. *Superior Court* (1982) 31 Cal.3d 424, 430-431 [180 Cal.Rptr. 489, 640 P.2d 108].)

 The right to exercise peremptory challenges "has always been held essential to the fairness of trial by jury." (*Lewis* v. *United States, supra,* 146 U.S. at p. 376 [36 L.Ed. at p. 1014].) It "is one of the most important of the rights secured to the accused. 'The end of challenge,' says Coke, 'is to have an indifferent trial, and which is required by law; and to bar the party indicted of his lawful challenge is to bar him of a principal matter concerning his trial.' . . . Any system for the empanelling of a jury that prevents or embarrasses the full, unrestricted exercise by the accused of that right, must be condemned." (*Pointer* v. *United States* (1894) 151 U.S. 396, 408 [38 L.Ed. 208, 214, 14 S.Ct. 410]; see also *Swain* v. *Alabama* (1965) 380 U.S. 202, 219 [13 L.Ed.2d 759, 771-772, 85 S.Ct. 824]; *Hines* v. *Enomoto* (9th Cir. 1981) 658 F.2d 667, 671-672; see Zeisel & Diamond, *The Effect of Peremptory Challenges on Jury and Verdict: An Experiment in a Federal District Court* (1978) 30 Stan.L.Rev. 491.)

The right is particularly critical for one accused of a capital offense. The jury must decide not only guilt, but life itself. A jury must "express the conscience of the community on the ultimate question of life or death." (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 519 [20 L.Ed.2d 776, 783, 88 S.Ct. 1770].) Any restriction on the exercise of peremptory challenges in this context threatens the fairness of the jury not only as to guilt but also as to penalty.[11]

 There was undeniably good cause to reopen jury selection in this case. The court's refusal to do so amounted to denying appellant the exercise of his allotted peremptory challenges. "[T]he peremptory challenge is a critical safeguard of the right to a fair trial before an impartial jury . . . ." (*People* v. *Williams* (1981) 29 Cal.3d 392, 405 [174 Cal.Rptr.

---

[11]The record illustrates the importance which additional peremptory challenges assumed in this capital case. Defense counsel plainly indicated that he was dissatisfied with the composition of the jury panel with respect to several jurors' views on the death penalty. As he informed the court, this dissatisfaction was the motivation behind his request to exercise his remaining peremptory challenges.

317, 628 P.2d 869].) ■ "The right to a fair and impartial jury is one of the most sacred and important of the guaranties of the constitution. Where it has been infringed, no inquiry as to the sufficiency of the evidence to show guilt is indulged and a conviction by a jury so selected must be set aside." (*People* v. *Riggins* (1910) 159 Cal. 113, 120 [112 P. 862].)

■ California courts have consistently held that "[t]he failure to grant a defendant the prescribed number of peremptory challenges when the record reflects his desire to excuse a juror before whom he was tried is reversible error." (*People* v. *Shaw* (1965) 237 Cal.App.2d 606, 611 [47 Cal.Rptr. 96]; see also *People* v. *Diaz* (1951) 105 Cal.App.2d 690, 696 [234 P.2d 300]; cf. *People* v. *Yates, supra,* 34 Cal.3d at p. 654.)

Accordingly, denial of counsel's request to use his peremptory challenges requires reversal of the judgment.

### III.

■ For guidance on retrial, this court must also address appellant's contention that the trial court erred in admitting the testimony of Alfred Velasquez that appellant had threatened physical violence to Joe Velasquez in February of 1978.

Evidence introduced at the guilt phase indicated that on Saturday night, July 21, 1979, Ernest Velasquez drove his father, Joe, home from a party. Ernest locked Joe's car in the garage and left the car and garage keys in Joe's house. That was the last time Joe was seen alive. On Sunday morning, Joe's body was found in his bedroom. He had died from multiple stab wounds. The bedroom had been ransacked. Property was missing from the bedroom, the living room, and the garage.

Joe's daughter Alice was appellant's common law wife. Appellant and Alice had formerly lived with Joe. Witnesses testified that on Saturday night, appellant made several attempts to obtain money and to borrow a car. He was away from home for several hours on Saturday night and during the early hours of Sunday morning.

On Sunday afternoon, the police discovered appellant driving Joe's car. Property from Joe's residence was in the car. Witnesses testified that appellant had been attempting to sell some of Joe's possessions to various people throughout the day. In a conversation with Alice following his arrest, appellant admitted that he had gone to Joe's house on Saturday evening.

Appellant testified at trial that he had indeed gone to Joe's house that night, looking for a place to sleep. He felt unwelcome at home for he had

argued with Alice and had been caught in a lie to her mother in an attempt to borrow her car. When he arrived at Joe's house, he found Joe dead. He said he panicked and did not call the police because he feared they would realize he was under the influence of heroin. He admitted taking Joe's property with the idea of selling it to raise money to return to Los Angeles.

Appellant's brother testified that he, not appellant, had killed Joe on Saturday night.

To refute appellant's testimony that he had gone to Joe's house to sleep, and to strengthen the inference that he had gone there to steal, the prosecutor sought to establish through his cross-examination of appellant that appellant and Joe had not been getting along. However, appellant maintained that he and Joe had a good relationship. Appellant also denied that he demanded money from Joe or threatened to assault him if the money were not given.

In rebuttal, the prosecutor called Alfred Velasquez, Joe's son. Alfred testified that Joe had telephoned him in February 1978—17 months before Joe's death—to say that he was frightened because appellant had demanded money and had threatened to assault him if he did not comply. At Joe's request, Alfred went to Joe's house and spent the night there to protect him.

Defense counsel objected to Alfred's testimony on the grounds of improper impeachment, hearsay, relevancy, improper character evidence, and on Evidence Code section 352 grounds.[12] The court ruled that the testimony was admissible for the limited nonhearsay purpose of explaining why Alfred went to Joe's house.

This ruling was erroneous. ██ A hearsay objection to an out-of-court statement may not be overruled simply by identifying a nonhearsay purpose for admitting the statement. The trial court must also find that the nonhearsay purpose is relevant to an issue in dispute. (§ 350; Jefferson, Cal. Evidence Benchbook (1972 ed.) § 1.3, pp. 5-10.) ██ Joe's statement to Alfred may well have established why Alfred acted as he did in February of 1978. However, Alfred's state of mind at that or any other time, as well as his reasons for going to his father's house in 1978, had no bearing whatsoever on any issue in the trial. Accordingly, the court's reason for admitting the evidence did not justify its ruling.

---

[12]Evidence Code section 352 provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

All statutory references in Part III are to the Evidence Code.

*People* v. *Scalzi* (1981) 126 Cal.App.3d 901 [179 Cal.Rptr. 61], illustrates the logical gap in the court's reasoning. There, the accused was arrested and charged with conspiring to sell controlled substances when police officers found him at a residence with drugs and packaging equipment. While the officers were at the residence, a caller telephoned and asked if "John had gotten it bagged up." The accused, whose name was John, did not live at the house and claimed he was there only to borrow grocery money.

The Court of Appeal held it was error to admit the police officer's testimony of the telephone conversation. The trial court had ruled this testimony admissible not for the truth that John was "bagging up," but for the non-hearsay purpose of showing the reason the police officer booked John on the drug charges. The Court of Appeal found that this asserted nonhearsay purpose did not render the evidence admissible because the officer's reasons for charging the accused with conspiracy to sell drugs were irrelevant. "[The officer's] *reaction* or state of mind after the telephone conversation and any actions he took based thereon shed no light on any issues presented in the case. Anything [the officer] did in response to the telephone conversation was irrelevant." (*People* v. *Scalzi, supra,* 126 Cal.App.3d at p. 907, italics in original.)

Similarly, Alfred's state of mind after hearing Joe's statement, as well as anything Alfred did in response to it, shed no light on any of the events which occurred 17 months later. Thus, evidence offered to prove this state of mind was irrelevant.

Nor could the trial court properly have admitted evidence of Joe's statement to prove Joe's fear of appellant. (See § 1250.)[13] Again, careful inquiry as to relevance is required. Such inquiry shows that Joe's state of mind was not at issue in this case.

■■■ This court has repeatedly held that a victim's out-of-court statements of fear of an accused are admissible under section 1250 only when the victim's conduct in conformity with that fear is in dispute. Absent such dispute, the statements are irrelevant. (*People* v. *Arcega* (1982) 32 Cal.3d 504, 526-527 [186 Cal.Rptr. 94, 651 P.2d 338]; *People* v. *Green* (1980)

---

[13]Section 1250 provides in part that "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or (2) The evidence is offered to prove or explain acts or conduct of the declarant. [¶] (b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

27 Cal.3d 1, 23, fn. 9 [164 Cal.Rptr. 1, 609 P.2d 468]; *People* v. *Ireland* (1969) 70 Cal.2d 522, 529 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].)

In *Arcega*, statements that the victim feared the accused "was going to hit her, to beat her up" were held inadmissible on this basis. "[T]here was no issue of fact raised by the defense with respect to [the victim's] conduct immediately preceding her death. Where a defendant has claimed that a victim has engaged in certain conduct which led to an accidental or justifiable homicide, then hearsay evidence of the victim's state of mind has been held admissible where such evidence tended to negate the claimed conduct of the victim. Thus, in *People* v. *Lew* (1968) 68 Cal.2d 774, 778-780 [69 Cal.Rptr. 102, 441 P.2d 942], state of mind evidence of the declarant's fear of the defendant was held to be relevant to disprove the defendant's claim that the declarant was sitting on his lap and examining his gun when it accidentally discharged. [¶] In the present case, appellant did not claim that his act of homicide was immediately preceded by any conduct by the hearsay declarant. . . . [¶] . . . Therefore, admission of the hearsay statements regarding [the victim's] fear of appellant and his 'weird' actions was error." (*People* v. *Arcega, supra,* 32 Cal.3d at pp. 526-528.)

█ Similarly, in this case there was no issue of fact as to Joe Velasquez's conduct on the night of his death. Appellant did not claim that Joe admitted him into the house or otherwise behaved in a friendly manner toward him on the night of the killing. Nor did the evidence raise any question as to whether the killing had been accidental or justifiable. The only disputed issue was the identity of the killer. Thus, Joe's state of mind was irrelevant and could not be used to justify admission of the disputed statement.

The only possible relevance of Joe's statement was to show appellant's knowledge that he was unwelcome at Joe's house. But Joe's statement was relevant for this purpose only if true. Appellant could not possibly have known he was unwelcome at Joe's house unless he actually made the threats. Thus, Joe's statement was inadmissible hearsay which did not come within any recognized hearsay exception. (§ 1200, subd. (a).[14])

█ The Legislature has expressly repudiated the reasoning under which a victim's expression of fear was formerly admitted to prove an accused's conduct. In 1965, the Legislature enacted section 1250, subdivision (b),

---

[14]Section 1200 provides that " '[h]earsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated. [¶] (b) Except as provided by law, hearsay evidence is inadmissible."

making inadmissible "evidence of a statement of memory or belief to prove the fact remembered or believed." (Stats. 1965, ch. 299, § 2, p. 1341.) As the comment to the section explains, this subdivision was included to invalidate prior case law which admitted evidence of a victim's fear to show that the accused had in fact made threats to him.[15]

A recent case has applied section 1250, subdivision (b) to evidence very similar to Alfred's testimony about Joe's fear. In *People* v. *Deeney* (1983) 145 Cal.App.3d 647 [193 Cal.Rptr. 608], Ed was convicted of the involuntary manslaughter of his wife, June. The Court of Appeal found that it was error to admit a witness's testimony that June had told him, "Ed hit me." It noted that the statement "is precisely the type of statement section 1250, subdivision (b) proscribes. It is a statement of June's memory of an event, offered to prove the event occurred. All of the traditional hearsay dangers are inherent in this statement. June's memory, perception, narration and sincerity are all in question." (*Id.,* at p. 653.)

■ In this case, Joe's statement that appellant threatened him was in effect offered to prove that the threat occurred. It was, therefore, squarely forbidden by section 1250, subdivision (b). It presented the "traditional hearsay dangers" noted by *Deeney* since it called into question Joe's "memory, perception, narration and sincerity." ■ ■ ■ ■ ■ It was thus inadmissible hearsay.[16]

■ Finally, even if Alfred's testimony were admissible over hearsay and relevance objections, the trial court's failure to rule explicitly on the section 352 objection rendered its admission erroneous.

---

[15]The comment to section 1250 notes that "[a] major exception to the principle expressed in Section 1250(b) was created in People v. Merkouris, 52 Cal.2d 672, 344 P.2d 1 (1959). That case held that certain murder victims' statements relating threats by the defendant were admissible to show the victims' mental state—their fear of the defendant. Their fear was not itself an issue in the case, but the court held that the fear was relevant to show that the defendant had engaged in conduct engendering the fear, i.e., that the defendant had in fact threatened them. That the defendant had threatened them was, of course, relevant to show that the threats were carried out in the homicide. Thus, in effect, the court permitted the statements to be used to prove the truth of the matters stated in them. . . . [¶] The doctrine of the *Merkouris* case is repudiated in Section 1250(b) because that doctrine undermines the hearsay rule itself. Other exceptions to the hearsay rule are based on some indicia of reliability peculiar to the evidence involved. [Citation.] The exception created by *Merkouris* is not based on any probability of reliability; it is based on a rationale that destroys the very foundation of the hearsay rule." (See Evid. Code, § 1200, subd. (a).)

[16]At trial, the prosecution also suggested that Alfred's testimony was admissible to rebut appellant's denial on cross-examination that he had threatened to "kick [Joe's] ass" on a previous occasion. This justification is untenable. "A party may not cross-examine a witness upon collateral matters for the purpose of eliciting something to be contradicted. [Citations.] This is especially so where the matter the party seeks to elicit would be inadmissible were it not for the fortuitous circumstance that the witness lied in response to the party's questions." (*People* v. *Lavergne* (1971) 4 Cal.3d 735, 744 [94 Cal.Rptr. 405, 484 P.2d 77].) Since appellant's alleged threat to Joe was inadmissible, the prosecution was not permitted to elicit appellant's denial of it and then to seek to prove it by extrinsic evidence.

In *People* v. *Green, supra,* 27 Cal.3d at pages 23-26, this court found that evidence of a victim's out-of-court expression of fear of the accused was admissible under section 1250, since the victim's conduct was at issue in that case. Nonetheless, it was error to admit the evidence over a section 352 objection without making an on-the-record determination that its probative value substantially outweighed the risk of undue prejudice. (*Id.,* at p. 26.)

*Green* noted the potential for prejudice which is inherent in this kind of evidence. "Testimony that a defendant threatened his victim prior to committing the crime charged is a particularly sensitive form of evidence of the victim's state of mind. In the case at bar it created a substantial danger that despite the limiting instruction, the jury—consciously or otherwise—might consider [the victim's] statement as evidence not only of her mental state but also of that of defendant, i.e., of the fact that defendant actually threatened to kill her if she left him and inferentially harbored an intent to do so; and the relevance of that intent to the crime charged should have been obvious." (*People* v. *Green, supra,* 27 Cal.3d at p. 26.)

This case presents the "obvious" danger of prejudice noted in *Green.*[17] Furthermore, several additional factors were present which weighed against admissibility under section 352. First, the alleged threat was extremely remote in time for it was made approximately 17 months before the killing. The passage of so much time greatly reduced the probative value of Joe's fearful state of mind.

Second, the evidence was cumulative. Two other Velasquez children had already testified that there were bad feelings between Joe and appellant and that appellant would not have been welcome at Joe's house. This testimony rebutted appellant's statements that he and Joe got along well. It clearly supported an inference that appellant could not reasonably have believed that he was free to sleep at Joe's house. Thus, the prosecutor's legitimate evidentiary needs had been met before Alfred's testimony was offered.

The additional facts in Alfred's testimony, consisting of appellant's threat of violence and Joe's fear, did not add substantially to this legitimate probative purpose. They did, however, carry the obvious potential for prejudice

[17]The prosecutor made the precise mistake which *Green* warned against. Even though the court admitted the evidence of the threat only for the limited purpose of showing Alfred's state of mind, the prosecutor argued to the jury that the evidence showed appellant had in fact threatened Joe on that occasion. In his argument, he stated that ". . . Alfred Velasquez had to get up one night in the—mid-1978 and go over and settle down his father because why did he go over there? *Because Mr. Armendariz had demanded some money from the poor old man, threatened to kick his ass if he didn't get it.*" (Italics added.)

noted in *Green*. Thus, the trial court's exercise of discretion under section 352 should have led to its exclusion.

Accordingly, Alfred's testimony should not have been admitted into evidence. In the event of a retrial, it should be excluded.

## IV.

The trial court erred in denying appellant the exercise of peremptory challenges to which he was entitled under the law. That error requires reversal of the judgment. In the event of a retrial, the jury should be instructed in accordance with *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131, that it may not sustain the felony-murder special circumstance allegations unless it finds that appellant intended to kill or to aid in a killing. Further, in any retrial, Alfred Velasquez's testimony concerning Joe's statements of appellant's alleged threat must be excluded.

The judgment is reversed.

Mosk, J., Kaus, J., Broussard, J., Reynoso, J., Grodin, J., and Lucas, J., concurred.