[No. H002234. First Dist., Div. Four. May 10, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
ALVIN RAY JOHNSON, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts IV and V.

1554

COUNSEL

Jimmie E. Tinsley, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Stan M. Helfman and David H. Rose, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CHANNELL, J.—A jury found appellant Alvin Ray Johnson guilty of robbery committed against a victim over 60 years of age (Pen. Code, §§ 211, 1203.09, subd. (f)),[1] false imprisonment (§ 236), and four counts of first degree burglary. (§§ 459, 460, subd. 1.) He was sentenced to nine years and four months in state prison. He appeals, contending that (1) the trial court improperly refused to reopen jury voir dire; (2) evidence of third party culpability was excluded; (3) the prosecutor committed misconduct; and (4) the false imprisonment was only incidental to the robbery. We affirm the judgment.

## I. FACTS

### A. *The Underlying Crimes*

On August 26, 1985,[2] the manager of an apartment complex on Acalanes Drive in Sunnyvale noticed that a screen had been removed from an apartment window. The window was open and a corner of the glass had been broken out near the lock. Larry Palacios's apartment had been ransacked and some stereo equipment was missing. Police determined that the intruder had entered by the window and were able to obtain several fingerprints from the area around the point of entry.

On September 28, Kathleen Schweitzberger returned to her apartment on Ayala Drive in Sunnyvale to find her VCR and an afghan missing. The police discovered that a window screen had been partly removed, the window was open, and her front door was unlocked. Neighbor Judith Cress had seen a man walking away from the apartment with a box and an afghan earlier that day. She described the man as a light-skinned Black man at least

---

[1] All statutory references are to the Penal Code, unless otherwise indicated.
[2] All dates refer to the 1985 calendar year, unless otherwise indicated.

six feet four inches tall, well-groomed afro, of athletic build, approximately 30-35 years old, and wearing a black jogging suit. In a photographic lineup, Cress selected a photograph that she thought resembled the man she saw, but she was unable to make a positive identification. The photograph she selected was not that of appellant Alvin Johnson. Police were unable to obtain any usable fingerprints from the apartment.

On October 2, a friend was looking after the Sunnyvale home of Carmen Sisikin, who was on vacation. When the friend entered the house on West McKinley Avenue, she saw that the house had been ransacked. A screen had been removed from a bedroom window, and both the window and the window lock were broken. A television set and some jewelry were missing. Someone had removed the lid from a candy jar and had left empty candy wrappers near it. Police were able to obtain a fingerprint from the candy jar lid.

The same day, Robert Hughey returned to his home across the street from Sisikin's house and noticed that the mesh had been removed from a window screen. Neighbor Albert Barron had noticed a young Black man near Hughey's house that morning. Barron described the man to police as 18 to 20 years of age, 6 feet tall, Black, and of slender build. No one had entered Hughey's house and nothing was missing from it.

Between 8:30 and 8:45 a.m. on October 8, Carole Weller came back to her Sunnyvale home on Noriega Avenue and heard the back door slam. She saw a tall dark man—who could have been Black, Chicano, or a well-tanned White person—run away from the house. Weller noticed that a window screen was bent out of shape, a window was cracked, the molding around a pane of glass next to her front door had been removed, and a sliding glass door was ajar. Weller also saw her VCR unplugged near the sliding glass door. One hundred and fifty dollars in tens and twenties was missing from a music box. Police were able to obtain fingerprints from the bent window screen.

On the morning of October 9, Alan Gee heard his dog barking at his Lanitos Avenue home in Sunnyvale and went to investigate. His front door was open and he saw a tall person running away from the house. Later, he discovered that one of his living room windows was broken and that the window adjacent to it had been opened. Nothing was missing from Gee's house, but police found several fingerprints on the windowsill, the window frame, and on a piece of broken glass.

That same morning, 65-year-old Josephine Case walked out of her Silver-wood Avenue home in Mountain View to take out the trash. When she

returned, a tall, slender Black man emerged from the bathroom with a towel over his face. He put the towel around Case's head, but she removed it. The man wanted money; Case did not have any. Case was very frightened and screamed until the man told her to be still or he would hurt her. He said he had a gun and he would use it. When the man went through her purse, she asked him for her digitalis—a heart medication. He took her upstairs and went through jewelry boxes and dresser drawers in two bedrooms. After a few minutes, the man put Case in the bathroom and tried to prevent her from getting out by tying electrical cords around the doorknob. Within five minutes, Case had freed herself, but the man was still there. Reminding Case that he had told her not to come out until he let her, the man put her back in the bathroom. When she freed herself 10 or 15 minutes later, he was gone. A stereo, a combination phone-radio, and a VCR were missing from the house. Police found latent fingerprints inside the house.

On October 10, Sunnyvale police arrested Johnson on an unrelated charge and fingerprinted him. That same evening, Albert Barron selected Johnson's photograph from a photographic lineup. He told police that he was 80 percent certain that the man in the photograph was the man he had seen at Hughey's house.

Officer Tim Davis of Sunnyvale interviewed Johnson in the early morning hours of October 11. After waiving his *Miranda* rights, Johnson told Davis that he lived on South Mary Avenue and that he was six feet five inches tall. He admitted being in Hughey's yard and talking with Barron, but denied involvement in any of the burglaries.

On October 14, Officer Walter Briefs of Sunnyvale compared a series of latent fingerprints to Johnson's prints. He identified latent fingerprints taken from the scenes of the Palacios, Sisikin, Weller, and Gee burglaries as belonging to Alvin Johnson.

On October 16, Officer Davis of Sunnyvale interviewed Johnson again, telling him that his prints had been found at the scenes of several Sunnyvale burglaries. Johnson said that he had handled property that might have been taken from the scene by the burglar, but he continued to deny his involvement in the offenses. Davis explained that Johnson's prints had been found at the burglary scenes as well as on stolen property. At this point, Johnson became upset, said that his fingerprints were not sufficient evidence to convict him, and ended the interview.

In the meantime, Mountain View police had prepared a composite drawing of the Case intruder based on Josephine Case's description. A Mountain View officer, Robert Scott, happened to show the composite drawing to a

Sunnyvale police officer, who in turn gave Scott a name. Scott prepared a photographic lineup that included a photograph of appellant Alvin Johnson, on whom suspicion now focused. On October 23, Josephine Case was shown a photographic lineup, but she was unable to positively identify Johnson as the intruder. However, a police technician found that one of the latent fingerprints taken from her Mountain View house matched Johnson's prints. On November 19, Scott questioned Johnson about the Case robbery, but he denied any involvement in it.

## B. *Voir Dire*

Johnson was charged with five counts of first degree burglary, and single counts of attempted burglary, robbery, and false imprisonment. After his first trial ended in a mistrial, voir dire began anew. On June 5, 1986, 12 regular jurors and 1 alternate juror, Mr. Moulden, were sworn to try the matter. The trial court closed the day by stating that the case would begin the next day with opening statements.

The following day, one of the regular jurors, Ms. Watkins, was discharged and Moulden was substituted as a regular juror. Initially, the trial court indicated that a new alternate would be selected. Johnson moved to reopen jury selection in its entirety. He explained that when the regular jury of which Watkins was a part had been sworn, he had three peremptory challenges remaining that could have been used against regular jurors. By the time Moulden was seated as a potential alternate, Johnson had exhausted his alternate peremptory challenge. He argued that the substitution of Moulden for Watkins altered the entire composition of the jury. For this reason, he asked that the entire jury selection be reopened, and that each attorney be granted the right to exercise any remaining peremptory challenges against any member of the jury.

The trial court noted that voir dire had been lengthy and that his inclination was to select another alternate juror and proceed to trial. Then, the court began to speculate about proceeding with the jury that had already been selected without a new alternate. Johnson explained why he thought the substitution of Moulden for Watkins altered the composition of the jury, but the trial court was not persuaded. As an alternative motion, he asked the judge to consider reopening voir dire only as to Moulden's seat. His motion to reopen was denied.

In light of this ruling, Johnson objected to the trial court's proposal to seat a new alternate. The prosecutor was reluctant to begin presenting evidence without an alternate, but the court decided to try the case without one.

## C. *Trial and Sentence*

The victims, eyewitnesses, and police officers from Sunnyvale and Mountain View each testified to the relevant facts. The prosecution also presented evidence that the Sunnyvale crime sites were in Johnson's neighborhood.

Early in the trial, the court ruled that the police officers could testify that they arrested Johnson, but could not refer to the fact that the arrest was based on a warrant for an unrelated offense. When the arresting officer testified about information on Johnson's fingerprint card, the prosecutor asked him Johnson's date of birth. The officer gave the date and went on to read other information on the card, including a reference to the warrant. Johnson moved for a mistrial based on violation of the trial court's earlier ruling. The prosecutor admitted that he had not advised this officer of the court's ruling. He argued that the officer did not identify the underlying offense, that the jury might assume that the arrest was for one of the charged offenses, and that many jurors might not understand the reference to a warrant. The trial court admonished the officer not to mention the warrant again, but ruled that the officer's statement was an innocent error that appeared to be harmless. The motion for mistrial was denied without prejudice to renew it later if it appeared that jurors attached significance to the reference.

When Josephine Case testified, she said that she could not compare the voice of the intruder with that of Johnson because she had not heard him talk. The prosecutor began to suggest "Perhaps he could —" when Johnson's attorney posed another question. A few minutes later, the prosecutor completed a request to have Johnson make some statements for the witness. Defense counsel objected, a bench conference occurred, and the matter was not mentioned again in open court. Outside the jury's presence, Johnson moved for a mistrial, charging that the prosecutor committed deliberate misconduct by his request. The trial court noted that the prosecutor had a right to ask for a voice identification, but that it was customary to notify the court of this request rather than to pose it first in open court. Johnson's motion for mistrial was denied.

As part of his defense, Johnson offered evidence that another person had been detained on suspicion of committing the Weller burglary in order to raise a reasonable doubt about the identity of the person who committed this offense. At 9:15 a.m. on October 8, an officer responding to the Weller burglary report spotted a man walking toward him carrying a grocery bag. The man hesitated momentarily when he saw the officer, an act that attracted the officer's attention. The man was detained and questioned by the officer. He was White, six feet five inches tall, in the vicinity of the Weller

house, lived in the neighborhood, and carried $196.82 in cash, much of it in $20 bills. The grocery bag contained groceries, some still cold, and a market receipt for $7.18. He was walking away from Noriega Avenue where the Weller burglary had occurred, and appeared to be walking from a grocery store adjacent to Noriega Avenue toward his home. The prosecutor noted that the man's fingerprints had been checked against those found at the scene and he had been eliminated as a suspect on the basis of the results of this test.[3] He also reminded the court that this man was White, but Weller had seen a dark-complected man run from her house. The court also noted that Johnson's prints were found on a screen at the Weller house. The court was skeptical about the merit of Johnson's proffered evidence, but took the motion to introduce this evidence under submission. Later, the officer testified about this suspect outside the presence of the jury. After this evidence was held inadmissible, Johnson opted not to present a defense.

Johnson was convicted of the Case robbery against a victim who was at least 60 years of age, the Case false imprisonment, and first degree burglaries of the homes of Palacios, Sisikin, Weller, and Gee—each offense for which the police found his fingerprints at the scene of the crime. He was acquitted of the Hughey attempted burglary and the Schweitzberger burglary, the two offenses for which no fingerprint identification was made. Statutorily ineligible for probation (see § 1203.09, subd. (f)), Johnson was sentenced to state prison for nine years and four months.[4]

## II. Voir Dire

■■■ Johnson contends that the trial court had discretion to reopen jury voir dire to permit him to exercise his remaining peremptory challenges, but abused that discretion by refusing to do so. Section 1068, governing the time for exercising peremptory challenges to prospective jurors, provides that a challenge "must be taken when the juror appears, and before he is sworn to try the cause; but the Court may for cause permit it to be taken after the juror is sworn, and before the jury is completed." Johnson contends that the jury was not complete within the meaning of section 1068 at the time he made his motion to reopen; the People contend that the jury was complete once Mr. Moulden was sworn as an alternate.

Underlying the question of when jury selection becomes complete within the meaning of section 1068 is the interrelated question of when jeopardy attaches for purposes of the constitutional prohibition against double jeopardy. ■■■ In state criminal proceedings, jeopardy attaches when the jury

---

[3] The man appears to have been arrested on the basis of unrelated outstanding warrants and was fingerprinted when booked for this offense.

[4] The trial court stayed sentence on the false imprisonment charge. (See § 654.)

is empaneled and sworn. (See *Crist* v. *Bretz* (1978) 437 U.S. 28, 35, 38 [57 L.Ed.2d 24, 31, 33, 98 S.Ct. 2156] [invalidating Montana statute providing that jeopardy did not attach until first witness is sworn]; see also U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, § 15.) When the jury is completed within the meaning of section 1068, the constitutional prohibition against double jeopardy comes into play. Under *Crist,* a trial court's discretion to reopen jury selection ends when jeopardy attaches. Any interpretation of the meaning of section 1068 must take into consideration the constitutional effect of that interpretation. Mindful of the connection between these two issues, we review the key cases.

Of the most relevant cases, the earliest is *People* v. *Hess* (1951) 107 Cal.App.2d 407 [237 P.2d 568], in which a trial court empaneled a jury of 12 regular jurors. Four days after denying a request to select alternate jurors, a regular juror was discharged. The trial court then ordered selection of two alternate jurors, one of whom was seated to replace the discharged juror. The defendants entered pleas of former jeopardy, but the trial court refused to discharge the jury on this ground. (*Id.,* at pp. 424-425.) On appeal, the Second Appellate District ruled that the selection of these two alternate jurors did not invade any of the defendants' substantial rights or result in any prejudice to them. The alternates "were selected prior to the introduction of any evidence and before the district attorney made his opening statement. They sat from the very inception of the proceedings that began with the introduction of the evidence; they had all the opportunities that were possessed by the regular jurors to see and hear the witnesses, and were bound by the same oath that was taken by the others . . . . The three essentials . . . of a trial by jury, viz., number, impartiality and unanimity, were preserved." (*Id.,* at p. 425.) Rejecting the defendants' claims of former jeopardy, the appellate court held that jeopardy did not attach until after the alternate jurors were sworn. (*Id.,* at pp. 425-426.)

In *In re Mendes* (1979) 23 Cal.3d 847 [153 Cal.Rptr. 831, 592 P.2d 318], 12 regular jurors were sworn and the trial court appeared to have denied a request to select an alternate juror. The following morning, a regular juror was discharged and the trial court proposed that the parties select a new regular juror and two alternate jurors. The defendants' motions for mistrial on the ground of former jeopardy were denied. During the selection of the additional jurors, the court permitted counsel to exercise unused peremptory challenges against any of the regular jurors. Three of the remaining eleven regular jurors were challenged by the parties. These jurors were replaced and a jury of 12 regular members and 2 alternates was selected and sworn. (*Id.,* at p. 851.) On appeal, the defendants argued that the lower court erred by permitting challenges to jurors who had already been sworn. (*Ibid.*) The California Supreme Court rejected this contention for two rea-

sons. First, the court examined the record and determined that the trial court always intended to select alternate jurors, despite some evidence to the contrary. As the jury selection process was not complete when the regular juror was discharged, the trial court retained authority to continue this process and to allow the parties to challenge already seated jurors. (*Id.,* at pp. 852-854.) However, the court did not rest its conclusion on "such factual speculation" alone. It also held that, in such circumstances, the trial court retains "the right to change its mind." (*Id.,* at p. 854.) Citing *Hess,* the court held that jeopardy did not attach until after the alternate jurors were sworn, thus giving the trial court the discretion to allow challenges to regular jurors who were already sworn. The fact that the composition of the 12-member panel was to change provided good cause for the trial court's exercise of this discretion. (*Id.,* at pp. 854-855.) As the alternates were selected and sworn before opening statements were made, witnesses were sworn, and evidence was introduced, this procedure did not constitute an invasion of the defendants' constitutional rights. (*Id.,* at p. 856.)

In the most recent case, *People* v. *Armendariz* (1984) 37 Cal.3d 573 [209 Cal.Rptr. 664, 693 P.2d 243], 12 regular jurors had been selected and sworn, and the parties were in the midst of selecting alternate jurors when 2 regular jurors were discharged. The defendant asked to be allowed to use some of the peremptory challenges allotted for use against regular jurors against the prospective alternate jurors. The court denied this request, finding that he was statutorily precluded from granting it. Once the defendant exhausted his allocation of peremptory challenges for alternate jurors, he moved to reopen selection of the regular jury and to be allowed to exercise his unused regular juror peremptory challenges. This motion was also denied. One of the jurors who was seated after the defendant exhausted his peremptory challenges was selected to sit as a regular juror. On appeal, the defendant challenged the trial court's restriction of the exercise of his peremptory challenges. (*Id.,* at pp. 578-579.) The California Supreme Court, citing *Mendes,* held that the trial court had the discretion to reopen jury selection and authorize the use of unused peremptory challenges until all alternate jurors were sworn. (*Id.,* at pp. 580-581.) Even if the trial court had not erred by failing to exercise its discretion, a denial of defendant's request would have been an abuse of discretion under the circumstances of this case. Relying on *Mendes,* the court held that good cause to reopen was established because the 12-member panel was to change. (*Id.,* at pp. 581-582.) The conviction was reversed for failure to grant a defendant the peremptory challenges to which he was entitled. (*Id.,* at p. 584.)

In essence, Johnson contends that these cases establish the trial court's discretion to reopen jury selection and its abuse of that discretion by its refusal to do so. On the question of whether the Johnson trial court had

discretion to reopen, it can well be argued that this case is factually distinguishable from these authorities. However, we need not decide whether the trial court had discretion to reopen jury selection.

Even if we assume arguendo that the trial court had this discretion, it clearly acted within its discretion by substituting alternate juror Moulden for the discharged regular juror. (See § 1123.) This substitution did not cause Johnson to be twice in jeopardy because the unity of the original jury was not destroyed. (*In re Mendes, supra,* 23 Cal.3d at p. 853; *People v. Burns* (1948) 84 Cal.App.2d 18, 26-27, 31-32 [189 P.2d 868]; see *People v. Peete* (1921) 54 Cal.App. 333, 366-367 [202 P. 51].)[5] In *Hess, Mendes,* and *Armendariz,* that one or more of the alternate jurors yet to be selected would sit as regular jurors was a factual certainty and compelled the conclusion that the trial court was required to reopen jury selection. In Johnson's case, the alternate juror—selected before the issue on appeal arose—was merely substituted for a discharged juror, a fairly routine trial court occurrence. (See § 1123.) The substitution having been made, the trial court did not abuse its discretion in deciding to proceed to trial without selecting additional alternate jurors. (§ 1089.) Having made this decision, there was no need to reopen jury voir dire. Johnson's authorities do not support a contrary conclusion.

### III.   THIRD PARTY CULPABILITY

██    Next, Johnson contends that the trial court committed prejudicial error by excluding his proffered evidence of third party culpability for the Weller burglary.    ██    A criminal defendant has a right to present evidence of third party culpability if it is capable of raising a reasonable doubt about his or her own guilt. (*People v. Hall* (1986) 41 Cal.3d 826, 833 [226 Cal.Rptr. 112, 718 P.2d 99].) This rule does not require that any evidence, however remote, must be admitted to show a third party's possible culpability. Evidence of another person's motive or opportunity to commit the crime, without more, will not raise a reasonable doubt about a defendant's guilt; direct or circumstantial evidence must link the third person to the actual perpetration of the crime. (*Ibid.; People v. Kegler* (1987) 197 Cal.App.3d 72, 80 [242 Cal.Rptr. 897].) Once the defendant's evidence has been found to raise a reasonable doubt, it may only be excluded if it is more prejudicial than probative. (*People v. Hall, supra,* 41 Cal.3d at p. 829; see Evid. Code, § 352.)

---

[5] In this case, Johnson's request to reopen voir dire might constitute a waiver of any double jeopardy claim. (See *Oregon v. Kennedy* (1982) 456 U.S. 667, 672-673 [72 L.Ed.2d 416, 422-423, 102 S.Ct. 2083] [mistrial]; *United States v. Dinitz* (1976) 424 U.S. 600, 607-610 [47 L.Ed.2d 267, 273-275, 96 S.Ct. 1075] [mistrial]; *People v. Balderas* (1985) 41 Cal.3d 144, 181 [222 Cal.Rptr. 184, 711 P.2d 480] [mistrial].)

Johnson claims that numerous facts about the man who was detained by police create a reasonable doubt about his own guilt: the presence of the third person in the vicinity of the crime shortly after the crime was committed, his height, the amount of cash he had on his person, the number of $20 bills he carried, his residence in the neighborhood, and the fact that he was walking away from the Weller house. The trial court admitted that these factors made the third person a likely suspect, but the prosecutor's offer of proof—that the man's fingerprints proved that he could not have been the intruder—was "too strong" to overcome. After excluding the proffered evidence, the trial court explained that if the man's fingerprints had not eliminated him as a suspect in the Weller burglary, the evidence would have been admitted. On appeal, Johnson contends that the trial court's ruling implied that his evidence was relevant, but that it was incredible in light of the other evidence—a finding that he challenges as an improper incursion into the jury's function.

A court's inquiry into the admissibility of evidence of third party culpability will always turn on the facts of the case. (*People* v. *Hall, supra,* 41 Cal.3d at p. 834.) We agree that the trial court may not invade the province of the jury by making credibility determinations about the proffered evidence. However, we interpret the trial judge's words to imply that when the circumstantial evidence that caused the police to suspect this third person of involvement in the Weller burglary *and* the uncontradicted fingerprint evidence that developed later was considered, the totality of the evidence did not rise to the level necessary to create a reasonable doubt about Johnson's guilt.

Johnson cites no case in which a defendant presents circumstantial evidence of third party culpability that is as effectively rebutted as by the prosecution's fingerprint exclusion evidence here, nor has our research revealed any similar authority. However, even the strongest circumstantial evidence case of third party culpability does not raise a reasonable doubt about a defendant's guilt when fingerprints found at the scene of the crime could not have been those of the third party. This conclusion does not require any credibility determination; Johnson's evidence is deemed to be credible for purposes of this motion, as is the prosecutor's uncontradicted evidence that the third party was eliminated as a burglary suspect after fingerprint comparison. Simply put, Johnson's evidence raised a possibility that the prosecution's evidence made an impossibility. As his proffered evidence could not logically raise a reasonable doubt about his guilt, the trial court properly excluded it.

IV., V.*

. . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Anderson, P. J., concurred.

**POCHÉ, J.**—I concur in affirming the judgment; however, I cannot join the majority's analysis of the jury selection issue. Unlike my colleagues I believe we have an obligation to consider and to resolve the question of whether the trial court here had the power to reopen the jury to challenge after Mr. Moulden was seated on the panel.

The majority assumes, without deciding the question, that the trial court still had discretion to permit reopening challenges to the jury at the time the court denied the defense requests to exercise its remaining peremptories. (Maj. opn., *ante,* p. 1562.) The question is pivotal; what we are really deciding is whether the jury was completed and double jeopardy had attached. While a double jeopardy claim is not being raised by this defendant, the specter of a double jeopardy claim looms every time a trial judge must rule on such a request.

If we as an appellate court duck the question of whether the trial court may properly reopen voir dire we create a quandary for trial judges: they must either decide to play it safe, deny the defendant's request and assume that at worse an appellate court may reverse for retrial. Or, if they grant the request to reopen voir dire and an appellate court subsequently tells them the ruling was wrong, then the defendant, otherwise properly convicted, must be released rather than be subjected to double jeopardy on retrial. In either case the People lose. At the least they pay for the cost of lost prosecutorial and judicial time. At the most they are subjected to the release of a guilty defendant into the community.

Having insisted that we ought to reach the question of whether the court still had the power to reopen challenges to the jury, I answer that it did.

Jeopardy attaches when the jury has been "empaneled and sworn." (*Crist v. Bretz* (1978) 437 U.S. 28 [57 L.Ed.2d 24, 98 S.Ct. 2156].) The rationale for this rule "lies in the need to protect the interest of an accused in retaining a chosen jury." (*Id.* at p. 35 [57 L.Ed.2d at p. 31].) Presumably a

---

*See footnote, *ante,* page 1553.

similar rationale underlies Penal Code section 1088 which provides "each party shall be entitled to have the panel full before exercising any peremptory challenge." Because California allows the court on a showing of cause to permit challenge to a juror after he is sworn but before the jury is completed (Pen. Code, § 1068), the state concept of jury completion is equivalent to the federal "'empaneled and sworn'" formula. (*In re Mendes* (1979) 23 Cal.3d 847, 854-855 [153 Cal.Rptr. 831, 592 P.2d 318].)

"The general rule is that where a court has indicated that a trial will be conducted with alternate jurors the impanelment of the jury is not deemed complete until the alternates are selected and sworn. [Citation.]" (*In re Mendes, supra,* 23 Cal.3d at p. 853.) Whether there will be alternate jurors and if so how many are discretionary decisions of the trial court. (Pen. Code, § 1089; *People v. Armendariz* (1984) 37 Cal.3d 573, 580, fn. 6 [209 Cal.Rptr. 664, 693 P.2d 243].) Furthermore, the court retains "the right to change its mind" on the question of alternates and their number. (*In re Mendes, supra,* 23 Cal.3d at p. 854; *People v. Hess* (1951) 107 Cal.App.2d 407, 424-426 [237 P.2d 568].)

In this case the trial judge was making two discretionary decisions: would he proceed to trial without selecting an alternate juror to replace Mr. Moulden and would he reopen to challenge the panel as newly constituted with Mr. Moulden sitting as juror number six. The two decisions were intimately linked. Once the court decided not to select a new alternate the jury was completed and jeopardy attached. Until it made that decision, however, the jury was not completed and the court retained the power to reopen the panel to challenge.

Thus, the question before us should be was it reversible error for the trial court to deny defendant's request to reopen the jury to challenge? In *People v. Armendariz, supra,* 37 Cal.3d 573, our Supreme Court found that a trial court which refused to reopen jury selection before the jury had been completed under the mistaken belief that it lacked the authority to do so under section 1068 had not made an "informed exercise of discretion." (At p. 581.) *Armendariz* concluded that the ruling would have been an abuse of discretion under the circumstances of that case. (*Ibid.*) The circumstances then set out in *Armendariz* included the fact that it was a death penalty case where defendant had been precluded from using over two-thirds of his challenges. (*Id.* at pp. 582-583.)

Here, too, the trial court acted in the belief that there was "no authority" for reopening jury selection. Under *Armendariz* then this court's decision to deny the defense motion was not an informed exercise of discretion. However, I cannot say that the ruling was also an abuse of discretion such as to

require reversal. I do not read *Armendariz* as creating a per se rule that denial of a motion to reopen jury selection is always reversible error.

All of this is not to say that the trial court could not reasonably have ruled the other way. Defendant presented a legitimate reason to reopen the jury to challenge. It was within the power of the trial court to permit reopening. The decision of the court to grant or to deny the motion was a discretionary one. I cannot say that under the circumstances before it the trial court abused its discretion to deny the motion to reopen the jury to challenge. Accordingly, I concur in the result reached by the majority.